IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BITHARMONY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| WARNER BROS. DISCOVERY, INC., | ) | **JURY TRIAL DEMANDED** |
| WARNER BROS. HOME | ) | |
| ENTERTAINMENT INC., | ) | |
| WARNERMEDIA DIRECT, LLC, and | ) | |
| HOME BOX OFFICE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORIGINAL COMPLAINT

Plaintiff BitHarmony LLC ("BitHarmony") files this Original Complaint against Warner Bros. Discovery, Inc., Warner Bros. Home Entertainment Inc., WarnerMedia Direct, LLC, and Home Box Office, Inc. ( collectively "Warner Bros.," or "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*. BitHarmony alleges that Warner Bros. has infringed and/or continues to infringe, directly and/or indirectly, the following BitHarmony patents: U.S. Patent Nos. 7,707,485 ("'485 patent"), 9,258,605 ("'605 patent"), 9,641,322 ("'322 patent"), and 9,826,259 ("'259 patent"), the "Asserted Patents," copies of which are attached hereto as Exhibits 1-4.

2.     More specifically, this case is about Warner Bros.' infringement of BitHarmony's Asserted Patents through Defendants' direct-to-consumer (DTC) streaming services platforms, including, but not limited to, discovery+ and HBO Max.

## BACKGROUND

3.    Indra Laksono ("Laksono")—a named inventor on most of the Asserted Patents—is a renowned scientist, inventor and entrepreneur. Laksono holds a Master of Science degree in Computer Science and Bachelor of Science degrees in Computer Science and Mathematics from the University of Toronto, and is the named inventor on over 90 issued U.S. and international patents, including in video codecs and streaming.

4.    Laksono's career included a number of senior positions at ATI Technologies, Inc. ("ATI") (a well-known graphics and multimedia semiconductor company) in various engineering and design roles.

5.    Laksono left ATI and co-founded ViXS Systems, Inc. ("ViXS"), with others from ATI, in approximately 2001 with the idea and goal of improving video streaming technologies. And this is precisely what Laksono and ViXS accomplished.

6.    Laksono served as the Chief Technology Officer (CTO) of ViXS from its founding through acquisition. In that role, he oversaw software engineering, R&D, ASIC architecture, application development, and technology strategy.

7.    Under his technology leadership, ViXS became a pioneering multimedia solutions innovator providing technologies for processing, managing, securing and distributing high-quality video and audio allowing seamless multimedia control, conversion, and connectivity to and between many classes and sizes of digital entertainment devices.

8.    ViXS, headquartered in Toronto, Canada, was a leading fabless semiconductor company that developed innovations enabling advanced transcoding and video processing technologies. Among other things, ViXS drove the transition to Ultra HD 4K across the value chain through its semiconductor chips by developing the world's first transcoder chip to support 10-bit Ultra HD 4K and High Efficiency Video Codec (HEVC). *See, e.g.*, https://www.prnewswire.com/news-releases/vixs-

announces-xcode-pro-350---worlds-first-transcoder-chip-to-support-10-bit-ultra-hd-4k-and-high-efficiency-video-codec-hevc-201612871.html.

9.      ViXS received industry recognition and awards, including being listed for four years running as one of Deloitte's fastest growing North American companies.

10.      ViXS built a large patent portfolio (video processing, codecs, media-streaming, and other technologies) to protect ViXS's valuable innovations. ViXS's relentless innovation resulted in over 470 patents issued and pending worldwide at the time of its acquisition in 2017 by Pixelworks, Inc. ("Pixelworks"), a leading provider of visual processing solutions. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1040161/000104016117000037/ex991closingpressrelease.htm.

11.      Upon acquisition, Laksono joined Pixelworks as President, Pixelworks Canada.

12.      The patents in this action describe and claim some of the extraordinary inventions developed by Laksono and/or ViXS.

13.      Defendants currently benefit and have benefited from these innovations, which—among other things—enable Defendants' Accused Services to encode and deliver high-quality video more efficiently and effectively. The patented technologies in the Asserted Patents are important to Defendants' business and Defendants' Accused Services including, e.g., discovery+ and HBO Max.

## **PARTIES**

14.      Plaintiff BitHarmony is a Delaware limited liability company with its principal place of business at 1000 N. West St., Suite 1400, Wilmington, DE 19801.

15.      BitHarmony owns patents covering foundational video streaming technologies, including the Asserted Patents resulting from the pioneering work and inventions at ViXS.

16.      BitHarmony holds all substantial rights and interest in the Asserted Patents, including the exclusive right to sue Defendants for infringement and recover damages.

17.      On information and belief, Warner Bros. Discovery, Inc. is a corporation organized under the laws of the State of Delaware.

18.      On information and belief, Warner Bros. Discovery, Inc. has its principal place of business at 230 Park Avenue South, New York, New York 10003.

19.      On information and belief, WarnerMedia Direct, LLC is a limited liability corporation organized under the laws of the State of Delaware.

20.      On information and belief, WarnerMedia Direct, LLC is a wholly owned and controlled subsidiary of Warner Bros. Discovery, Inc.

21.      On information and belief, WarnerMedia Direct, LLC has its principal place of business at 30 Hudson Yards, New York, New York, 10001.

22.      On information and belief, Warner Bros. Home Entertainment, Inc. is a corporation organized under the laws of the State of Delaware.

23.      On information and belief, Warner Bros. Home Entertainment, Inc. is a wholly owned and controlled subsidiary of Warner Bros. Discovery, Inc.

24.      On information and belief, Warner Bros. Home Entertainment Inc. has its principal place of business at 4000 Warner Boulevard, Burbank, California, 91522.

25.      On information and belief, Home Box Office, Inc. is a corporation organized under the laws of the State of Delaware.

26.      On information and belief, Home Box Office, Inc. is a wholly owned and controlled subsidiary of Warner Bros. Discovery, Inc.

27.      On information and belief, Home Box Office, Inc. has its principal place of business at 30 Hudson Yards, New York, New York, 10001.

## **JURISDICTION AND VENUE**

28.      This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 101 *et seq.*

29.      This Court has exclusive subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338.

30.      This Court has specific and general personal jurisdiction over Defendants consistent with the requirements of the Due Process Clause of the United States Constitution.

31.      This Court has general personal jurisdiction over Warner Bros. Discovery, Inc. by virtue of Warner Bros. Discovery, Inc.'s incorporation in Delaware. Warner Bros. Discovery, Inc. has appointed a registered agent for service of process: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

32.      This Court has general personal jurisdiction over WarnerMedia Direct, LLC by virtue of WarnerMedia Direct LLC's formation in Delaware. WarnerMedia Direct, LLC has appointed a registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

33.      This Court has general personal jurisdiction over Warner Bros. Home Entertainment, Inc. by virtue of Warner Bros. Home Entertainment, Inc.'s incorporation in Delaware. Warner Bros. Home Entertainment, Inc. has appointed a registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

34.      This Court has general personal jurisdiction over Home Box Office, Inc. by virtue of Home Box Office, Inc.'s incorporation in Delaware. Home Box Office, Inc. has appointed a registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

35.      This Court has specific personal jurisdiction over Defendants because they have, directly and/or through agents and/or intermediaries, committed acts and continue to commit acts of patent

infringement, including within Delaware, giving rise to this action and have established sufficient minimum contacts with Delaware such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

36.    Defendants, directly and/or indirectly through agents and intermediaries, have committed and continue to commit acts of infringement, including in the United States and Delaware. Defendants have committed and continue to commit acts of infringement by making using, selling, offering for sale and/or importing into the United States, and within this District, products and/or services, such as, e.g., video content on discovery+ and HBO Max, in a manner that infringes the Asserted Patents by, for example, implementing or being capable of implementing methods, systems and devices for transcoding, adaptive bit rate streaming and the encryption/decryption processing claimed in the Asserted Patents. Defendants, for example, use the infringing Accused Services to place video content into the stream of commerce over the internet with the knowledge and/or understanding that such Accused Services were being utilized for the purpose of offering services and videos in Delaware.

37.    On information and belief, Defendants regularly conduct and have conducted business in Delaware, and purposefully avail themselves of the privileges of conducting business in Delaware. On information and belief, Defendants, and/or their agents and/or intermediaries, make, use, import, offer for sale, sell, and/or advertise their products and/or services in Delaware, sufficient to give rise to jurisdiction.

38.    On information and belief, Defendants derive and have derived substantial revenue from the Accused Services within Delaware, and/or expect or should reasonably expect their actions to have consequences in Delaware.

39.    Defendants' infringing activity has led to foreseeable harm and injury to BitHarmony.

40.    Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). As set forth above, Defendants have committed acts of infringement in this District, Defendants reside in this District, and Defendants are incorporated in this District.

## THE ASSERTED PATENTS

41.     The Asserted Patents generally relate to video streaming technologies as described further below.

42.     The Asserted Patents are not directed to merely an abstract idea or any patent-ineligible concept. Instead, the Asserted Patents are directed to novel and unconventional improvements and include an element or combination of elements demonstrating patent eligibility for at least the reasons provided below and the reasons provided in the Declaration of Dr. Kevin Almeroth (attached as Exhibit 9), which is incorporated in its entirety herein by reference.

### U.S. Patent No. 7,707,485

43.     The '485 patent, entitled "System and method for dynamic transrating based on content," was lawfully issued on April 27, 2010. A true and correct copy of the '485 patent is attached as Exhibit 1 and incorporated herein by reference.

44.     The '485 patent names Indra Laksono as inventor.

45.     BitHarmony owns by assignment the entire right and title in and to the '485 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

46.     The '485 patent is not directed to an abstract idea or any patent-ineligible concept for at least the reasons provided herein and those provided through the Declaration of Dr. Kevin Almeroth incorporated herein by reference. *See* Ex. 9 at ¶¶ 40-51. The '485 patent is directed to novel and unconventional improvements to the operation of a multimedia processing device and method for transcoding multimedia data according to its content. It introduces an architecture that enables the multimedia device to transition to content-aware encoding. Ex. 9 at ¶ 44. The '485 patent provides improvements over prior content blind processing that forced a binary choice between (1) indiscriminate quality reduction by reducing the bit rate or resolution across the entire data stream to conserve storage

7

space, which materially degraded the viewing experience regardless of the content's importance ('485 patent at 1:20-23), or (2) capacity limitations by retaining high content quality while strictly limiting the total amount of data that could be stored and/or streamed cost-effectively ('485 patent at 1:23-25). *See* Ex. 9 at ¶ 42.

47.      The written description of the '485 patent describes in technical detail each limitation of the claims, allowing a person having ordinary skill in the art to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

48.      The '485 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the constraints of storage space and network bandwidth in digital video environments, specifically the inability of prior systems to optimize data efficiency without "indiscriminately" sacrificing quality, which the patent resolves by dynamically modifying encoding parameters (such as bit rate or resolution) in response to real-time analysis of content characteristics like volume changes or motion vectors. '485 patent at 1:10-26; 1:61-2:11; 4:8-58; 6:26-7:5; 7:33-8:7; *see also* Ex. 9 at ¶¶ 43-45. For example, the claimed invention of claim 1 of the '485 patent is an improvement to the functioning of the multimedia processing device itself. By (1) "identifying a select template" from amongst "a plurality of templates based on the program" represented by multimedia data, which represents "multimedia content of [the] program," (2) "analyzing the multimedia content" for its characteristics, and (3) modifying the multimedia data "based on an application of [the select template's rules] to the characteristics of the multimedia content," the technological improvement of content-aware transcoding is embodied in the claims. *Id.* at claim 1; Ex. 9 at ¶ 45; *see also id.* at ¶¶ 46-47.

49.      The '485 patent provides background information about the tradeoffs inherent in pre-existing video processing architectures used for video distribution. '485 patent at 1:10-26. The patent

explains that conventional multimedia solutions forced a rigid trade-off between content quality and storage space, resulting in either indiscriminate quality reduction or limited cost-effective storage capacity. *Id*. at 1:19-26. This created a scenario where the choice was between two flawed approaches, e.g., either "indiscriminately reduce content quality" to minimize the space required to store the data, or elect to retain high content quality, which severely limits the amount of data that can be stored or streamed in a "cost-effective manner." *Id*. The inventors of the '485 patent recognized that content-blind processing ignored video content properties as the encoding process worked without knowledge of the specific program/scene content. *Id*. at 1:20-27; 2:45-3:25 (reducing the bit rate of a commercial to reduce the amount of multimedia data without affecting the multimedia data content of the program that the viewer likely cares about); 4:9-29 (reducing the bit rate (or not) based on the capabilities of the receiving device and/or the type of network it is connected to); 6:26-34 (analyzing the motion between frames and content of frames when encoding the multimedia data); 7:46-8:6 ("a portion of the content of the multimedia data is analyzed to determine whether the content characteristic associated with the rule is present in the analyzed content portion….[W]hen the content characteristic is present, one or more of the content actions associated with the rule are performed….As a result, the original multimedia data may be modified so as to reduce its size while retaining suitable content quality.") Unlike the claimed invention, content-blind processing used fixed, pre-set parameters (e.g., constant bit rate) for transcoding regardless of the content (e.g., whether the scene/program was dark, bright, static, fast-moving, etc.). In short, prior to the '485 patent, multimedia transcoding lacked the intelligent, rule-based adaptability required to optimize bit rates (and therefore storage/bandwidth) without sacrificing perceived quality. There was no accounting for the unique characteristics of different programs/scenes. Ex. 9 at ¶ 43.

50.     To address the "bandwidth limitations of the network" inherent in modern streaming environments, the solution implements a "dynamic transrating" system that modifies streams in real-time based on specific content analysis. '485 patent at 4:9-14; 7:33-8:7. Rather than using a static

encoding profile, the system selects a "rules template" that is "indexed not only by, for example, program type, but also by one or more characteristics of the multimedia device... and/or the network…." *Id.* at 4:14-29.

51.      Existing systems and methods for multimedia content distribution and storage can impose technical burdens or fail to adequately balance content quality against storage space and bandwidth limitations. *See generally id.* at 1:19-26. Specifically, conventional solutions often "elect to indiscriminately reduce content quality," thereby degrading the viewer experience, or "elect to retain content quality," which severely limits the amount of data that can be stored or transmitted in a "cost-effective manner. *Id.* This led to problems and unnecessary expense, because data was either wasted on portions of the program users do not value—such as commercials where users "typically do not pay as much attention"—or the quality of the entire stream was reduced to meet the "data storage limitations of the multimedia device and/or bandwidth limitations of the network." *Id.* at 3:12-18; 4:9-14. The '485 patent addresses these burdens by implementing "dynamic transrating based on content," where a "transrater" analyzes content characteristics to selectively modify the bit rate or resolution of specific portions of the data, ensuring the "modified multimedia data" retains quality where it matters while reducing file size elsewhere. *Id.* at Title; 3:12-4:30.

52.      The inventive benefits of the '485 patent over prior solutions primarily stem from its approach to utilizing a transcoding "template" selected based on the program being transcoded, and used to modify the content based on the characteristics of the media content representing the program. This context-aware transcoding drove the encoding decisions based on programs and its characteristics, rather than applying a single static compression standard across the entire file, which allows the system to "reduce the overall amount of multimedia data without materially affecting the multimedia content of the program that a viewer is likely to care about." *Id.* at 2:45-4:30. This patented solution enables granular control where "content actions" like "changing a bit rate" or "changing a resolution" are

triggered by specific events—such as a "change in average audio volume" or specific motion vector analysis—addressing prior art limitations where solutions had to indiscriminately reduce content quality to meet the bandwidth limitations of the network. *Id.* at 3:5-4:29. These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of conventional approaches that force a rigid choice between "content quality or storage space." *Id.* at 1:19-20.

53.     The systems and methods claimed in the '485 patent provide a dynamic technique for transrating multimedia information based on specific content characteristics found within the stream. Claim 1, for example, recites a multimedia processing device that incorporates multiple inventive concepts described in the '485 patent, including "identifying a select template... based on the program," "analyzing the multimedia content... to determine characteristics of the multimedia content," and "modifying... the multimedia data based on an application of the plurality of rules of the select template to the characteristics of the multimedia content." Claim 1 offers a specific "how" for transcoding multimedia data, e.g., selecting actions—such as changing a bit rate, resolution, or audio volume—when specific content characteristics are detected during analysis. *Id.* at claim 1.

54.     The '485 patent claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the content-aware selection of encoding parameters driven by rule-based content analysis, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by allowing aggressive data reduction on less important segments, such as commercials while retaining quality for primary content, solving a unique resource allocation dilemma between quality and storage space in video systems. The patent introduces a unique hardware-based, on-the-fly approach where detection of characteristics (like volume spikes or motion) and corresponding content actions are tightly coupled with the video processing pipeline, thus facilitating optimization of the data stream for specific devices or networks. This integration is a specific technical implementation that provides a distinct performance advantage over generic transcoding solutions.

11

55.     The inventions of the '485 patent, and, for example, claim 1, is directed to significantly more than a transcoding system because the program and its multimedia content dictate the selection of a template and the application of the selected template's rules for modifying the multimedia's bit rate, resolution, and/or audio volume. '485 patent at claim 1; *see also* Ex. 9 at ¶ 49. Accordingly, the use of the program to select an encoding template/ladder was not a routine activity in 2005. The specific combination of a multimedia processing device, a select template based on the program, rules for modifying bit rate/resolution/volume, and actual modification of the multimedia data characteristics based on analyzed/determined characteristics of the multimedia content and the selected template, provides a measurable reduction in bit rate costs for storage and transmission. '485 patent at 8:5-7 ("the original multimedia data may be modified [transcoded] so as to reduce its size while retaining suitable content quality."). Conventional transcoders of the time were content-blind, and the shift to the claimed architecture, which is content-aware, represents a paradigm shift in digital asset management. Ex. 9 at ¶ 50; *see also id.* at ¶ 48.

### U.S. Patent No. 9,258,605

56.     The '605 patent, entitled "System and method for transrating based on multimedia program type," lawfully issued on February 9, 2016. A true and correct copy of the '605 patent is attached as Exhibit 2 and incorporated herein by reference.

57.     The '605 patent names Lewis Leung and Indra Laksono as inventors.

58.     BitHarmony owns by assignment the entire right and title in and to the '605 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

59.     The '605 patent is a continuation-in-part of the '485 patent and the discussion above of prior solutions and their shortcomings applies equally to the '605 patent.

12

60.     The '605 patent is not directed to an abstract idea or any patent-ineligible concept for at least the reasons provided herein and those provided through the Declaration of Dr. Kevin Almeroth incorporated herein by reference. *See* Ex. 9 at ¶¶ 52-62.

61.     The written description of the '605 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

62.     The '605 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the rigid management of storage resources and bandwidth in multimedia distribution, specifically the inability of prior systems to adapt encoding constraints to the specific genre of content, which the disclosure resolves by establishing "peak bit rate" and "average bit rate" limits based on the "multimedia program type" and dynamically scaling these limits. '605 patent at 2:23-39; 6:64-11:39. For example, claim 19 of the '605 patent provides a specific technical solution to the problem of resource management in a multimedia transcoding system and is directed to novel and unconventional improvements to the functioning of the transcoding system itself. By determining peak and average bit rate limits based on program type, the system allocates its bit rate limits where it is most computationally and perceptually efficient. That is to say, the "original multimedia data" is "modified so as to reduce its size" (bit rate) "while retaining suitable content quality." '605 patent at 10:24-30. This solution solves the problem described in the '605 patent where "conventional solutions either elect to indiscriminately reduce content quality content" or indiscriminately "retain content quality, thereby limiting the amount of data that may be stored in a cost-effective manner." '605 patent at 1:29-34; *see also* Ex. 9 at ¶ 57.

63.     The '605 patent provides background information about the tradeoffs inherent in pre-existing video processing architectures used for video distribution. The disclosure explains that

conventional multimedia storage solutions face a "choice of either content quality or storage space," resulting in either indiscriminate quality reduction or limited cost-effective storage capacity because they utilized content-blind processing. '605 patent at 1:20-36; *see also* Ex. 9 at ¶ 53. This created a scenario where the choice was between two flawed approaches, e.g., either "indiscriminately reduce content quality content, thereby reducing the space required to store the data," or elect to "retain content quality, thereby limiting the amount of data that may be stored in a cost-effective manner." '605 patent at 1:20-36; *see also* Ex. 9 at ¶ 57.

64.     To address the "limited capacity to store additional multimedia data" inherent in recording environments, the solution implements a "transrating based on multimedia program type" system that establishes encoding constraints. '605 patent at Title; Fig. 5; 10:31-11:29. Rather than solely relying on content characteristics, the system selects a "peak bit rate limit" and an "average bit rate limit" specific to the program content. *Id.* at 6:64-11:29.

65.     Existing systems and methods for multimedia content distribution can impose technical burdens or fail to adequately balance content quality against bandwidth limitations. Specifically, conventional solutions often "elect to indiscriminately reduce content quality content," thereby degrading the viewer experience, or "elect to retain content quality," which can affect bandwidth. *Id.* at 1:20-36. This led to problems and unnecessary expense, because encoding resources were inefficiently allocated without regard to the "multimedia program type"—for example, treating a "drama program" characterized by "relatively little motion" the same as a "football game." *Id.* at 8:30-60. The '605 patent disclosure addresses these burdens by determining a "peak bit rate limit" and an "average bit rate limit" based on the "multimedia program type," ensuring that the "transrated multimedia data" retains appropriate quality for its genre while accounting for the network bandwidth. *Id.* at Abstract; 2:6-39; 3:54-65.

66.     The inventive benefits of the '605 patent over prior solutions stem from its approach to utilizing "multimedia program type" to determine "peak bit rate" and "average bit rate" limits, rather than applying a single static compression standard across the entire file, which allows the data generated by the transrating process to be modulated according to the capabilities of the device and the network bandwidth. *Id.* at 8:61-11:29. This patented solution enables adaptive control where bit rate limits are adjusted according to the media content, addressing prior art limitations where solutions had to "indiscriminately reduce content quality" regardless of the specific genre requirements. *Id.* at 1:20-36. These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of conventional approaches that force a rigid choice between content quality or data associated with the stream. It was not known at the time to analyze multimedia content for transcoding purposes. The inventors, however, recognized that by analyzing the multimedia content they could "identify the multimedia program type of the program represented by the multimedia data, and based on this determined multimedia program type, select a peak bit rate limit, an average bit rate limit, or both, which are used to control the degree to which the multimedia data is transrated so that the resulting transrated multimedia data has a peak bit rate that does not exceed the identified peak bit rate limit and/or an average bit rate that does not exceed the identified average bit rate limit." '605 patent at 3:54-65; *see also* Ex. 9 at ¶ 53.

67.     Using the peak and average bit rate limits, the inventors recognized that the transcoder could "maintain the average bit rate" with "minimal visual quality loss" even when the framesets have "higher motion and complexity" thereby maintaining "a higher visual quality." '605 patent at 9:38-50. In this way, "the resulting modified multimedia data is provided for storage in a storage device, … or provided for transmission to one or more multimedia devices, … via a network. As a result, the original multimedia data may be modified so as to reduce its size while retaining suitable content quality." '605 patent at 10:24-30.

68.    The systems and methods claimed in the '605 patent provide a targeted approach to bandwidth and storage management by tailoring bit rate constraints to the specific nature of the multimedia content. Claim 19, for example, recites a system that incorporates multiple inventive concepts described in the '605 patent, including a "content analyzer... configured to" (1) "determine a multimedia program type" and (2) "determine a peak bit rate limit and an average bit rate limit based on the multimedia program type." Furthermore, it includes a "transcoder... configured to transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit." Ex. 9 at ¶ 55. Claim 19 offers a particular "how" for transcoding the multimedia data: systematically deriving distinct operational limits (peak versus average bit rates) from the identified program type and enforcing these limits during the transrating process to optimize resource usage. The prior art lacked a content-aware transcoder that utilized peak and average bit rate limit targets for transrating thus confirming the unconventionality of the claimed inventions. Instead, transcoding was a standalone task that was not tethered to the type of content being transcoded. Ex. 9 at ¶ 56.

69.    The prosecution history also confirms that claimed combination of features was non-conventional at the time of invention. For example, Patent Trial and Appeal Board explained that the prior art failed to disclose determining "a peak bit rate limit" and an "average bit rate limit" based on the "multimedia program type of a first multimedia data representative of a multimedia program," and "transrating the first multimedia data to generate a second multimedia data having a peak bit rate … and an average bit rate" not greater than the respective limits. The Examiner found the Board's decision persuasive and allowed pending claim 25, which issued as claim 19. Ex. 9 at ¶ 62.

70.    The '605 patent claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the dynamic calibration of encoding parameters based on program classification, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by enabling different rate profiles for different program types—such as allowing higher peaks

for fast moving content sports while restricting averages for slow moving content like a news segment—solving a unique optimization problem in video systems regarding the efficient use of storage and transmission bandwidth. The patent introduces a unique hardware-based approach where program content and rate control logic are tightly coupled with the video transcoding pipeline, thus facilitating automated compliance with varying network requirements. This integration is a specific technical implementation that provides a distinct performance advantage over generic transcoding solutions that apply uniform bit rate settings regardless of content type.

### U.S. Patent No. 9,641,322

71.     The '322 patent, entitled "Container agnostic decryption device and methods for use therewith," lawfully issued on May 2, 2017. A true and correct copy of the '322 patent is attached as Exhibit 3 and is incorporated herein by reference.

72.     The '322 patent names Paul Ducharme as inventor.

73.     BitHarmony owns by assignment the entire right and title in and to the '322 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

74.     The '322 patent is not directed to an abstract idea or any patent-ineligible concept for at least the reasons provided herein and those provided through the Declaration of Dr. Kevin Almeroth incorporated herein by reference. *See* Ex. 9 at ¶¶ 80-105. The '322 patent is directed to novel and unconventional improvements to in computer and media delivery functionality, the ability to process encrypted media streams with significantly improved security and lower latency. The '322 patent provides improvements over prior media encryption and decryption techniques.

75.     The written description of the '322 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the

17

nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

76.     In 2012, digital content delivery was limited by container-centric encryption protocols, such as encrypted Internet Protocol (IP) packets, Transport Streams (TS), or Packetized Elementary Streams (PES)—where the entire payload of the container was encrypted. '322 patent at 1:31-40. The inventors recognized that encrypting the entire payload made "[c]ertain operations such as trick mode video operations are not able to operate on encrypted content because the framing information, such as the group of pictures (GOP) structure, is not available in the encrypted state." *Id.* at 1:51-55. Based on this recognition, the inventors realized that in container-based solutions "in order to perform trick mode operations such as fast forward, rewind, etc., the encrypted content must be decrypted and must reside in memory." *Id.* at 1:55-58; *see also*; Ex. 9 at ¶ 81.

77.     "The process of decrypting compressed content at the container level is an expensive and unsecure process which involves multiple transfers to/from memory which requires additional memory buffers and consumes bandwidth." '322 patent at 2:5-8. "This introduces a security risk because clear compressed content resides in memory for a period of time" and there were "various attacks where hackers attempt to read and export the compressed content, particularly in low end software only solutions where third party software operates in the same memory space that stores the content to be protected." *Id.* at 2:8-14. "The process of decrypting compressed content also inserts latency because it requires additional time and overhead to manipulate the content between the various stages of compress/encrypt and decrypt/decode." *Id.* at 2:20-23. "This can force the system to operate on large blocks of data (i.e. large containers) which are generally not aligned to the native video/audio boundaries." *Id.* at 2:23-26; *see also* Ex. 9 at ¶ 82.

78.     The '322 patent discloses an unconventional architectural solution that shifts the security boundary by performing encryption and decryption at the Elementary Stream (ES) level rather

than the container level. As illustrated in FIG. 2, the invention utilizes a parser to separate an elementary bit stream (110) into distinct components: unencrypted start code sequences (10, 12) and a compressed payload bit stream (20). By specifically encrypting the payload blocks while leaving the framing and control headers unencrypted, the patent enables a container-agnostic format that maintains security across any transport medium. '322 patent at 5:9-42; *see also* Ex. 9 at ¶ 83.

79.     This solution is unconventional because it does not encrypt the entire container. The inventors figured out portions of the container that could be encrypted and what could be left unencrypted, thus leaving structural framing and timing information unencrypted for trick play operations, for example, while the underlying media content remains secure and encrypted. This specific technical improvement improves security and reduces latency and memory bandwidth by eliminating the need for the expensive and redundant transfers to/from memory buffers required by traditional container-level decryption. Ex. 9 at ¶ 84.

80.     The inventions of the '322 patent represent a transformative shift in media processing architecture that provides a specific, technological solution to problems inherent in conventional container-level security. By relocating the security boundary to the Elementary Stream (ES) level, the '322 patent enables a device to process encrypted media in ways that were previously impossible without compromising content security. Ex. 9 at ¶ 85.

81.     The inventions claimed in the '322 patent do not merely describe the abstract concept of decrypting data; instead, they define a specific, unconventional architecture that improves the efficiency and security of a video processing device through specific technical means. Ex. 9 at ¶ 86. For example, the patent discloses embodiments that eliminate the need for additional memory buffers and reduce the number of read/write operations because the content encryption/decryption is embedded within the encode/decode codec. This directly results in reduced memory utilization and reduced memory bandwidth, which are concrete improvements to the hardware's operational efficiency. *Id.* at

18:61-19:18; *see also* Ex. 9 at ¶ 87. Moreover, unlike conventional methods that hide all data within an encrypted container, the '322 patent's specific method of directly encrypting the elementary bit stream while leaving framing information un-encrypted allows the system to perform complex tasks like trick modes and seamless splicing without the computational overhead of full decryption. Ex. 9 at ¶ 88.

82.      The invention enables atomic operations, such as a Read/Decrypt/Decode/Write to Memory sequence. As the '322 patent explains, "[o]ne aspect of the security improvement associated with ES encryption is … a decoder can perform an atomic Read/Decrypt/Decode/Write to Memory operation, an encoder can perform an atomic Read/Encode/Encrypt/Write to Memory operation, a transcoder can perform a Read from Memory/Decrypt/Transcode/Encrypt/Write to Memory operation, etc.," which "addresses a fundamental security weakness in modern security devices which decode, encode or transcode encrypted A/V content." '322 patent at 18:32-41. This ensures that "clear compressed content never resides in memory," eliminating a fundamental security vulnerability found in prior conventional systems where content was exposed during the transition between decryption and decoding. '322 patent at 18:67-19:1; *see also* Ex. 9 at ¶ 89.

83.      The improvements advanced by the patent are supported by claim language. The claims define a specific dual-mode decryption process, applying different methods to "standard length" and "non-standard length" (remainder) blocks. See, e.g., '322 patent at 23:58-24:16. This technical detail may be used for maintaining the error concealment property of video and audio encoding, ensuring that single-bit errors do not propagate and destroy large portions of the media signal, as they would in traditional chained encryption. Ex. 9 at ¶ 90.

84.      The independent claims of the '322 patent define a specific, multi-step technological process that departs from conventional container-level encryption. For example, the claims expressly require a video processing device that operates on "at least one partially encrypted elementary bit stream." '322 patent at 23:59-60. This language formalizes the shift from the conventional container

level (IP/TS/PES) to the ES level, where first portions are encrypted and second portions (headers/framing) are left unencrypted. Ex. 9 at ¶ 91.

85.    The claims further recite the specific requirement to "segment the at least one partially encrypted elementary bit stream into a plurality of blocks" and, crucially, to "separat[e] the plurality of blocks into a first subset of blocks of standard length and a second subset of blocks of non-standard length" (Claim 11). This segmentation is the technical mechanism that allows the claimed system to handle the residual bits of a media stream without traditional, error-prone chaining methods. '322 patent at 25:9-24; *see also* Ex. 9 at ¶ 92.

86.    The claims require applying a "first of a plurality of decryption methods" for standard blocks and a "second of the plurality of decryption methods" for the non-standard subset. This separate application of methods is the specific implementation that preserves the error concealment property of the media, which conventional systems often sacrificed. Ex. 9 at ¶ 93.

87.    This claim language demonstrates that the '322 patent is directed to a specific improvement in computer functionality, the ability to process encrypted media streams with higher security and lower latency, rather than an abstract concept. Ex. 9 at ¶ 94.

88.    The claims of the '322 patent provide innovative unconventional technological solutions. More specifically, they recite a specific, physical hardware arrangement and a non-generic processing method. Independent claim 1 recites a "video processing device... comprising: a machine that includes: a key storage device... and a decryption processing device". '322 patent, claim 1. These are physical, tangible components known to a POSITA. Ex. 9 at ¶ 95.

89.    The claim language also pinpoints "how" the invention provides a technical solution by reciting a specific segmentation and multi-method decryption process: "segment the at least one partially encrypted elementary bit stream into a plurality of blocks"; "separating the plurality of blocks into a first subset of blocks of standard length and a second subset of blocks of non-standard length";

21

and "applying a first of a plurality of decryption methods for decrypting each of the first subset... and applying a second of the plurality of decryption methods for decrypting each of the second subset... separately from the first subset". '322 patent at claim 11; *see also* Ex. 9 at ¶ 96.

90.      A POSITA having read the specification would have recognized that the '322 patent's separately handled decryption of non-standard (residual) blocks—implemented via the decrypt-2 algorithm, is a critical, specific technical mechanism to ensure the decryption process remains truly container-agnostic. '322 patent at 13:55-64. As described in Claim 1, this methodology segments the partially encrypted elementary bit stream into distinct subsets based on block length, applying a first decryption method to standard blocks and a second, separate method to the non-standard remainder. Ex. 9 at ¶ 97.

91.      This dual-mode implementation prevents the bit-stream corruption and loss of the error concealment property that would otherwise occur if a conventional block-cipher were generically applied to partial blocks. By specifically preserving unencrypted framing information and start code sequences within the elementary stream ('322 patent at 6:64-7:4), this mechanism enables trick mode and splicing operations while the content remains in a fully secure, encrypted state. This provides a technical capability that was absent in conventional container-level encryption architectures. Ex. 9 at ¶ 98.

92.      The '322 patent provides a fundamental architectural improvement over conventional systems by shifting the security boundary from the container level to the container-agnostic Elementary Stream (ES) level. By intentionally leaving "framing information for all layers of audio/video distribution (i.e. all IP, TS, PES containers) un-encrypted," the inventors recognized they could overcome some of the "limitations and disadvantages of conventional and traditional approaches" described in the background of the patent. '322 patent at 2:27-28; 5:25-27. For instance, by leaving second portions of the at least one partially encrypted elementary bit stream are unencrypted the

innovative system can access critical headers and timing data, enabling trick mode and splicing functions, while the underlying media payload remains in a secure, encrypted state. Ex. 9 at ¶ 99.

93.    As shown in the hardware schematics of FIG. 1 and FIG. 18, the invention integrates a specialized interface device (element 120/220), a dedicated memory device (element 122/222), and a high-speed processing device (element 124/224) via a localized bus architecture (element 130/230). This unique hardware integration facilitates a Read/Decrypt/Decode/Write to Memory operation that is handled atomically within the codec pipeline itself. By embedding these functions into a single hardware engine (video processing device) the '322 patent eliminates the security risk inherent in conventional software-only or asynchronous solutions where clear compressed content resides in memory for a period of time, thereby providing a concrete improvement to security functionality. Ex. 9 at ¶ 100.

94.    This specialized integrated execution architecture, where decryption and decoding are handled in a single integrated pipeline, provides multiple distinct, non-abstract technical improvements over conventional container-based systems. *See* Ex. 9 at ¶¶ 101-104.

### U.S. Patent No. 9,826,259

95.    The '259 patent, entitled "Managed degradation of a video stream," lawfully issued on November 21, 2017. A true and correct copy of the '259 patent is attached as Exhibit 4 and is incorporated herein by reference.

96.    The '259 patent names Indra Laksono as inventor.

97.    BitHarmony owns by assignment the entire right and title in and to the '259 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

98.    The '259 patent is not directed to an abstract idea or any patent-ineligible concept for at least the reasons provided herein and those provided through the Declaration of Dr. Kevin Almeroth incorporated herein by reference. *See* Ex. 9 at ¶¶ 63-79. Instead, the '259 patent is directed to novel and

unconventional improvements in media streaming. The '259 patent provides improvements over prior media transmission techniques by utilizing a sophisticated managed degradation protocol that results in the dynamic analysis of actual time of frame transmission completion and comparison with a predetermined threshold until the stream can be transmitted in real-time. Ex. 9 at ¶ 75.

99.      The written description of the '259 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

100.      The '259 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including managing degradation of video streams in fixed bandwidth networks to prevent saturation and ensure consistent delivery of multiple streams. '259 patent at 8:61-9:19. For instance, the '259 patent explains that as media resolution increases (e.g., 1080i), standard network architectures at the time failed to maintain real-time delivery. The problem is not just bandwidth, but the physical inability of a fixed-capacity network to support the footprint of the stream. Specifically, the '259 patent explains that "[w]ith extremely high resolutions, such as the resolution of 1920×1080i used in high definition television (HDTV), the data transmission rate of such a video image stream will be very high even after compression... [some networks will] be physically and/or logistically incapable of simultaneously supporting multiple receiving/output devices." '259 patent at 1:35-54. "[I]f the video sequence is choppy, is not synchronized, is delayed, or is not received by all the designated receiver client units, the representation of the display data does not meet the predetermined criteria…." *Id.* at 6:50-53. The '259 patent describes "managing a degradation... based on a bandwidth of a transmission link" for instances when the "actual" time of transmission begins to drift from the "expected" time. *See generally* '259 patent, *see also* claim 12.

101.    To address the scenario where the actual time of transmission drifts from the expected time, the '259 patent utilizes a feedback loop where the encoder determines the minimum bits required to reach a specific quality level. "[T]he amount by which the resolution and/or precision of a victim stream v is [changed] based on the degree to which the actual frame transmission completion time... exceeds the estimated frame transmission completion time." *Id.* at 5:55-59.

102.    At the time of the '259 patent's priority date (no later than March 30, 2001), "media streams" required "high transmission rates, or bandwidth, for effective and/or timely transmission." '259 patent at 1:21-26. And, in many cases, "the cost and/or effort of providing the required transmission rate [was] prohibitive." '259 patent at 1:26-28. It was known to compress media to deal with this transmission rate problem. '259 patent at 1:28-35. However, with "extremely high resolutions, such as the resolution … used in high definition television (HDTV), the data transmission rate of [] a video image stream will be very high even after compression." '259 patent at 1:35-38. The inventors recognized that a "high data transmission rate," like those used for HDTV, caused additional problems, like "data storage" and "expense," and the inability of output devices, like a television, of "handling the transmission," bandwidth capacity issues around streaming HDTV, etc. '259 patent at 1:38-54; *see also* Ex. 9 at ¶ 64.

103.    Existing methods for handling video streams in fixed bandwidth networks had a "transmission rate problem" where "data transmission rate … will be very high even after compression," leading to data storage requirements that are "prohibitively expensive." '259 patent at 1:28-43. Beyond storage, the '259 patent highlights a hardware mismatch where "many output devices are incapable of handling the transmission" due to resolution limitations. *Id.* at 1:43-48. The patent also describes a "fixed bandwidth" bottleneck where networks are "physically and/or logistically incapable of simultaneously supporting multiple receiving/output devices" because they lack a mechanism to manage network traffic to assure consistent and sustained delivery. *Id.* at 1:48-54. This lack of active

management results in a "representation of the display data" that is "choppy, is not synchronized, [or] is delayed" whenever the network is close to saturation. *See generally id*. at 6:40-56. Prior to the '259 patent, HDTV-based streaming created a fundamental network management problem that conventional systems could not solve without performance issues, potential system failure, or data loss. Thus, the inventors explained that the invention is related to "reducing bandwidth overload" in a "media data transmission" system. *Id*. at 1:15-17; *see also* Ex. 9 at ¶ 65.

104.     The '259 patent addresses these technical bottlenecks by implementing an active orchestration system that manages "network traffic to assure consistent and sustained delivery" through a feedback loop. *Id.* at 6:33-39. To address network saturation, the patented solution monitors the "actual time of frame transmission completion" and, when it exceeds the "estimated transmit time" by a "predetermined threshold," the system generates a stream having "less data." *Id.* at 3:53-65; *see also id*. at Abstract; 2:25-56. This is achieved, for example, by changing "quantization factors... resulting in a decrease in the amount of data transmitted," a process technically consistent with adjustment of the Quantization Parameter (QP) to reduce bit rate while maintaining a target quality level. *Id.* at 4:11-32; 5:42-6:13. If bit rate reduction is insufficient, the solution may mitigate "fixed bandwidth" constraints by "managing degradation in transmission quality," wherein the system will "scale down" the resolution to ensure the media "is transmitted without exceeding a maximum allowed delay time." *Id.* at 2:10-3:20. Finally, to support multiple users on a single pipe, the system utilizes a "weighted priority scheme" to select "victim streams," mirroring the logic where individual renditions are dynamically throttled to ensure the aggregate "representation of the display data" meets the "predetermined criteria" for real-time playback. *Id.* at 3:66-4:32; 6:40-56.

105.     The inventive benefits of the '259 patent over prior solutions primarily stem from its approach to adaptive degradation at the stream level, rather than uniform compression, which allows selective reduction in data rate for victim streams while maintaining overall network stability. This

bandwidth-agnostic method enables operations like multi-client broadcasting without full recompression, addressing prior art limitations where fixed compression obscures timing information, necessitating buffers and re-processing that consumes additional memory, bandwidth, and introduces latency. Furthermore, by embedding the patented solution within the gateway server, the invention reduces overload risks by preventing streams from exceeding tolerances in shared networks, lowers overall system overhead through fewer adjustments and no need for separate monitoring stages, and maintains compatibility with existing MPEG and similar systems via transcoding capabilities. These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of prior non-adaptive compression methods, facilitating more efficient and reliable handling of multimedia content across various networks and applications. Ex. 9 at ¶¶ 66-75.

106.    The systems and methods claimed in the '259 patent provide improved bandwidth management for video stream processing. Claim 12, for example, recites a method that incorporates multiple inventive concepts described in the '259 patent, including receiving a first data stream representative of a series of display frames; managing a degradation of the first data stream based on a bandwidth of a transmission link to generate a second data stream representative of the series of display frames, wherein a degree of degradation of the first data stream is incremented for successive portions of the second data stream until a first compressed portion of the second data stream is determined to be transmissible such that the second data stream will be displayed in real time; transmitting the second data stream via the transmission link; wherein the first compressed portion of the second data stream is determined to be transmissible such that the second data stream will be displayed in real time when an expected time of transmission of a second compressed portion of the second data stream via the transmission link is within a predetermined tolerance of an actual time of transmission of the second compressed portion of the second data stream via the transmission link; and wherein the first data stream is degraded to generate the second data stream using a first compression technique and wherein the

degree of degradation is incremented based on implementing different compression parameters for each of the successive portion of the first data stream. '259 patent at claim 12; *see also* Ex. 9 at ¶¶ 66-69. Similar to claim 12, claim 1 also offers a particular "how" for managing streams: systematically monitoring transmission times and degrading selected ones before saturation, ensuring data remains deliverable to clients. '259 patent at claim 1. Unlike static prior art solutions that struggled with transmission rate fluctuations, the claimed invention utilizes a sophisticated managed degradation protocol. Ex. 9 at ¶ 66.

107.    Put another way, the claimed process degrades the data stream until it is appropriately displayable in real time. '259 patent at 3:20-65. By grounding the degradation logic in the real time display of the data stream, the invention ensures that streaming data can be "displayed properly in real time" based on predetermined criteria so that it is not "choppy, [un]synchronized, [] delayed,…." thereby improving "the display of the video sequence." '259 patent at 6:40-56; *see also* Ex. 9 at ¶ 67.

108.    As the patent describes, this "managed degradation" process allows for a degree of precision and responsiveness that was not previously known or routine. The patent determines "real time" capability of streaming by matching the expected time of transmission against the actual time of transmission within a predetermined tolerance. By incrementing the "degree of degradation" for "each successive portion" of the stream based on real time link capacity, the invention provides a specific technical tool that optimizes the internal functionality of the computer network itself, rather than merely using a computer to perform a generic business task. Ex. 9 at ¶ 70.

109.    The '259 patent claims are directed to a specific improvement in the functioning of a gateway media server, specifically the automated orchestration of an adaptive bandwidth footprint across a plurality of data streams to ensure "sustained delivery within acceptable parameters." '259 patent at 6:33-39. Rather than an abstract idea, the claims describe a technical implementation of an egress-aware rate control mechanism that solves the "transmission rate problem" inherent in certain

networks. *Id.* at 1:22-38; *see also* 3:54-65; 7:34-39. This integration facilitates a "steady state" where media is "transmitted without exceeding a maximum allowed delay time," effectively protecting the client-side buffer. *Id.* at 3:1-4.

110.    The '259 patent provides an unconventional solution to a novel problem uniquely arising in the realm of computer networks, the real time transmission of video over variable-bandwidth links. The invention moves away from discrete, file-based switches and instead executes a real-time, algorithmic bitstream degradation where the "degree of degradation is incremented" for "each successive portion" of the data until it can be displayed in real time. By claiming this specific, iterative degradation process rather than the general concept of "sending data," the '259 patent identifies a technical improvement that is necessarily rooted in computer technology and, therefore, is not directed to an abstract idea. Ex. 9 at ¶ 74.

111.    The patent's "managed degradation" loop, which increments stream degradation until real-time transmissibility is achieved, represents a fundamental improvement in computer network functionality and media streaming. By grounding its logic in a synchronized comparison of expected versus actual transmission times, the '259 patent solves the specific technical problem of bandwidth saturation in fixed-capacity networks. This iterative feedback process, constitutes a network-aware architecture that is physically impossible to perform as a "mental process" or through human intervention. Ex. 9 at ¶ 75.

112.    This provides a number of distinct technical improvements. First, the inventions disclosed in the '259 patent are a particularized implementation that goes beyond the abstract idea of data compression and streaming. The disclosed invention optimizes the bit rate of a data stream at a level of granularity that allows it to be transmitted and displayed in a dynamic environment where conventional systems would fail. By incrementally degrading the stream, the invention transforms the

conventional data streaming process from a binary all-or-nothing state into an improved continuous

solution for lower total bandwidth usage. Ex. 9 at ¶ ¶75-77.

113.    The claimed invention also implements a specific technical guardrail via a

"predetermined tolerance" check that governs the transmission. This is not a generic feedback loop; it is

a control mechanism that measures whether the stream satisfies the "predetermined criteria" for display

or whether it needs to be further degraded to satisfy the predetermined criteria. This is a specific timing

threshold to ensure that the "second data stream will be displayed in real time." By enforcing a

"predetermined tolerance," the '259 patent transforms a non-deterministic network link into a

predictable transmission channel, an unconventional significant non-abstract achievement that

significantly improves the overall reliability of streaming data by eliminating buffering and other

transmission rate problems. Ex. 9 at ¶ 78.

### The Asserted Patents and 35 U.S.C. § 287(a) Compliance

114.    BitHarmony, and its predecessors-in-interest, have complied  with  any  applicable

marking  requirements relating to the Asserted Patents under  35  U.S.C. § 287(a) at least because the

asserted method claims do not require marking and/or there is nothing to mark.

### ACCUSED SERVICES AND ACTIVITIES

115.    The Accused Services include Defendants' direct-to-consumer (DTC) streaming

services platforms, e.g., discovery+, HBO, HBO Max, Max, and Premium Sports Product, which

collectively include video from brands/products, such as, Discovery Channel, Max, discovery+, CNN,

DC, TNT Sports, Eurosport, HBO, HGTV, Food Network, OWN, Investigation Discovery, TLC,

Magnolia Network, TNT, TBS, truTV, Travel Channel, MotorTrend, Animal Planet, Science Channel,

Warner Bros. Motion Picture Group, Warner Bros. Television Group, Warner Bros. Pictures Animation,

Warner Bros. Games, New Line Cinema, Cartoon Network, Adult Swim, Turner Classic Movies,

Discovery en Español, Hogar de HGTV and others.

116. The Accused Services include, for example, the backend processes, including, for example, transcoding (e.g., transrating), content-adaptive encoding, per-title encoding, file-based video transcoding, encoding, and managed degradation of video streams for the purpose of providing videos to users. The Services further include, without limitation, systems and processes for decrypting compressed video signals.

117. Charts showing exemplary infringing functionality are attached as Exhibits 5-8. The Accused Services are further defined in each of the exemplary claim charts at Exhibits 5-8.

118. On information and belief, all Accused Services are configured and operate in substantially the same way with respect to the Asserted Patents because Warner Bros. employs the same technical platform and infrastructure for all Accused Services.

119. Upon information and belief, Warner Bros. has had knowledge and notice of the Asserted Patents, and its infringement thereof, since the patents issued. Upon information and belief Warner Bros., as a technology company, regularly monitors video streaming technology advances, and it monitored or was otherwise aware of the Asserted Patents, especially due to their impact on Warner Bros. plans for its own technology and streaming business.

120. Despite having knowledge of the Asserted Patents prior to the Original Complaint being filed, upon information and belief, Warner Bros. has never undertaken any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Warner Bros. has continued to infringe one or more claims of the Asserted Patents.

121. Alternatively, to the extent that Warner Bros. has avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, it was willfully blind. Upon information and belief, to the extent it lacked actual knowledge of infringement, prior to the filling of this action, Warner Bros. deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that it infringed BitHarmony's patents, and specifically the Asserted Patents, and

31

was therefore willfully blind. Upon information and belief, Warner Bros. lacks written policies disseminated to employees regarding monitoring or avoidance of patent infringement by Warner Bros. and lacks mechanisms for employees to report patents which they believe Warner Bros. may infringe. Upon information and belief, Warner Bros. and its employees subjectively understood that there was a high likelihood that patents filed on the innovations at issue read on the Accused Services.

122. At least as of the commencement of this action, Warner Bros. has both actual knowledge and notice of the Asserted Patents, and it continues to willfully infringe the Asserted Patents.

123. Therefore, upon information and belief, Warner Bros.' infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate, entitling BitHarmony to increased damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

124. Upon information and belief, Defendants derive revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the Asserted Patents, including in this District and elsewhere in the United States.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,707,485

125. BitHarmony incorporates by reference the preceding paragraphs as though fully set forth herein.

126. Pursuant to 35 U.S.C. § 282, the '485 patent is presumed valid.

127. Warner Bros. had knowledge and notice of the '485 patent no later than filing of the Original Complaint.

128. Warner Bros. infringes the '485 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of the '485 patent.

32

129.     On information and belief, Warner Bros. has infringed and continues to infringe one or more claims of the '485 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Services.

130.     Warner Bros. makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the '485 patent.

131.     For example, attached as Exhibit 5, and incorporated herein by reference, is a claim chart setting forth a description of at least one example of Warner Bros.' infringement of at least method claim 1 of the '485 patent. Exhibit 5 applies claim 1 to the Accused Services. The descriptions and infringement theories in Exhibit 5 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Warner Bros. in the course of this case.

132.     As shown in the exemplary claim chart of Exhibit 5, Warner Bros. infringes the '485 patent by, for example, using in the United States methods covered by at least claim 1 of the '485 patent and thus directly infringes the '485 patent, literally or under the doctrine of equivalents in violation of 35 U.S.C. § 271.

133.     Warner Bros.' infringement of the '485 patent is willful as of the filing of the Original Complaint.

134.     Warner Bros.' infringement has damaged and will continue to damage BitHarmony, and BitHarmony is entitled to recover from Warner Bros. damages sustained as a result of Warner Bros.' infringement of the '485 patent, but in no event less than a reasonable royalty.

## COUNT II: PATENT INFRINGEMENT OF U.S. PATENT NO. 9,258,605

135.     BitHarmony incorporates by reference the preceding paragraphs as though fully set forth herein.

136.        Pursuant to 35 U.S.C. § 282, the '605 patent is presumed valid.

137.        Warner Bros. had knowledge and notice of the '605 patent no later than filing of the Original Complaint.

138.        Warner Bros. infringes the '605 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of the '605 patent.

139.        On information and belief, Warner Bros. has infringed and continues to infringe one or more claims of the '605 patent, including but not limited to claim 19, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Services.

140.        Warner Bros. makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the '605 patent.

141.        For example, attached as Exhibit 6, and incorporated herein by reference, is a claim chart setting forth a description of at least one example of Warner Bros.' infringement of at least system claim 19 of the '605 patent. Exhibit 6 applies claim 19 to the Accused Services. The descriptions and infringement theories in Exhibit 6 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Warner Bros. in the course of this case.

142.        As shown in the exemplary claim chart of Exhibit 6, Warner Bros. infringes the '605 patent by, for example, using in the United States systems covered by at least claim 19 of the '605 patent and thus directly infringes the '605 patent, literally or under the doctrine of equivalents in violation of 35 U.S.C. § 271.

143.        Warner Bros.' infringement of the '605 patent is willful as of the filing of the Original Complaint.

34

144.    Warner Bros.' infringement has damaged and will continue to damage BitHarmony, and BitHarmony is entitled to recover from Warner Bros. damages sustained as a result of Warner Bros.' infringement of the '605 patent, but in no event less than a reasonable royalty.

**COUNT III: PATENT INFRINGEMENT OF U.S. PATENT NO. 9,641,322**

145.    BitHarmony incorporates by reference the preceding paragraphs as though fully set forth herein.

146.    Pursuant to 35 U.S.C. § 282, the '322 patent is presumed valid.

147.    Warner Bros. had knowledge and notice of the '322 patent no later than filing of the Original Complaint.

148.    Warner Bros. infringes the '322 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of the '322 patent.

149.    On information and belief, Warner Bros. has infringed and continues to infringe one or more claims of the '322 patent, including but not limited to claim 11, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Services.

150.    Warner Bros. makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the '322 patent.

151.    For example, attached as Exhibit 7, and incorporated herein by reference, is a claim chart setting forth a description of at least one example of Warner Bros.' infringement of at least method claim 11 of the '322 patent. Exhibit 7 applies claim 11 to the Accused Services. The descriptions and infringement theories in Exhibit 7 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Warner Bros. in the course of this case.

152.      As shown in the exemplary claim chart of Exhibit 7, Warner Bros. infringes the '322 patent by, for example, using in the United States methods covered by at least claim 11 of the '322 patent and thus directly infringes the '322 patent, literally or under the doctrine of equivalents in violation of 35 U.S.C. § 271.

153.      Warner Bros. also, directly or indirectly, directs and controls customers' use of its Accused Services. For example, customers' access and use of discovery+ and HBO Max are governed at least by Warrner Bros. respective Terms of Use. *See, e.g.*, https://www.wbd.com/dplus-us-visitor-agreement (discovery+); https://www.hbomax.com/terms-of-use/en-us (HBO Max). By way of further example, Warner Bros. also controls the upload of video content to, and for use in, its Accused Services. *See, e.g.*, https://partnerhub.warnermediagroup.com/ (content partner hub providing customers must be onboarded to one of two supported methods and providing media ingest specifications and media outbound specifications).

154.      Warner Bros. also has induced and continues to induce infringement of the '322 patent pursuant to 35 U.S.C. § 271, including at least claim 11, by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Services, including, for example, by encouraging its customers to use the Accused Services to decrypt video.

155.      The "Accused Services" are processes that involve, for example, using Google's Widevine Digital Rights Management (DRM) to protect and stream content across various platforms. Transcoded data within the WBD/Max services remains encrypted until the very last moment. As the compressed segments arrive at a user's device, the CDM uses a license key to decrypt only the specific blocks of data needed for the current frame. Once decrypted, the compressed video is sent to the decoder and finally rendered to a viewer's screen.

156.      Using the Accused Services constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 11 of the '322 patent, as described, for example, in Exhibit 7.

157.    Warner Bros. induces infringement, for example, by providing software (e.g., the discovery+ or HBO Max application) that, when used by third parties (e.g., customers or other content viewers) to stream media to televisions, personal computers, phones tablets, or other devices, as directed and intended by Warner Bros. cause those third parties to, for example, make and/or use, the inventions claimed in the '322 patent.

158.    Warner Bros. acts of encouragement include: providing to customers and intending that customers purchase and/or use the Accused Services, providing instructions on how to do so, working with customers to implement, install, and/or operate the Accused Services, fully supporting and managing customers continuing use of the Accused Services, providing technical assistance to customers during their continued use of the of Accused Services, and purposefully and voluntarily placing the Accused Services in the stream of commerce with the expectation that they will be used by customers in the United States including in this District. Furthermore, Warner Bros. has actual knowledge of how the Accused Services operate, including how use infringes the '322 patent. Warner Bros. has undertaken these acts of encouragement with the specific intent that customers use of such Accused Services as intended by Warner Bros. in a manner that infringes the asserted claims of the '322 patent. *See, e.g.*, https://www.wbd.com/dplus-us-visitor-agreement (discovery+ terms of use "govern your use of discovery+"; "The Platform provides you with access to the Content streamed over the internet to compatible devices."; provides eligibility criteria, account creation and subscription purchase, and system and compatibility requirements, including "To use the Platform, you will need to use a computer, mobile device, streaming media player or other device that meets the Platform's system and compatibility requirements (which we may update from time to time). Features and functionalities that we make available through the Platform may differ by device. Please check the requirements periodically, as we may change or stop supporting any hardware or software platforms at any time."; service and platform updates, including mandatory service updates that could require consent to the

update or installation or upgrade to maintain access, and platform updates relating to, e.g., device and software compatibility and security improvements; can suspend or terminate access to discovery+ at any time for any reason); https://www.hbomax.com/terms-of-use/en-us (HBO Max terms of use "which govern your use of the Platform"; who can access the platform; how to create an account, who can purchase a subscription, and identification of authorized users; system and compatibility requirements, including, e.g., "To use the Platform, you will need to use a computer, mobile device, streaming media player or other device that meets the Platform's system and compatibility requirements (which we may update from time to time). Features and functionalities that we make available through the Platform may differ by device."; service and platform updates, including mandatory service updates that could require consent to the update or installation or upgrade to maintain access, and platform updates relating to, e.g., device and software compatibility and security improvements; can suspend or terminate access to the platform for any reason or no reason).

159.    For example, Warner Bros. induces customers to infringe the '322 patent by encouraging them to install and operate the Accused Services, which each Accused Service alone or in combination with the customer's device, constitutes infringement of the '322 patent.

160.    For example, Warner Bros. advertises and promotes the Accused Services on its websites (*see, e.g.*, https://www.wbd.com/our-brands, https://www.discoveryplus.com/, https://www.hbomax.com/) and in app stores (such as, *e.g.*, Apple's app store and the Google Play app store) in connection with the mobile application for the Accused Services that can be installed on customer's devices (such as, *e.g.*, Apple and Android devices or other devices), and encourages customers to configure and operate their mobile, computing or other devices in an infringing manner. *See, e.g.*, https://www.discoveryplus.com/ ("discovery+ is available for most smartphones, tablets and desktop browsers, and most connected devices, including Amazon Fire TV streaming devices and Amazon Fire TV Edition Smart TVs; Apple iPads, iPhones, iPod touches and Apple TVs; Google

devices and platforms including Android phones, tablets and Android OS devices, Chromecast with

Google TV, Google Chromecast and Chromecast built-in devices; Microsoft Xbox One and Series S/X

devices; the Roku platform; Samsung Smart TVs from 2017 and newer; VIZIO Smart TVs from 2017

and newer; and LG Smart TVs from 2018 and newer."); https://www.hbomax.com/faq/ways-to-get

(identifying ways to get HBO Max, including providing instructions to "Download the HBO Max app

and subscribe through the stores listed below. Amazon Appstore[,] Apple App Store[,] Google Play [,]

Roku Channel Store[,] Samsung TV[,] Verizon +play[,]"; further listing "TV, Internet, Digital &

Wireless Providers" and listing TV, computer, game console, mobile and tablet devices with HBO

Max.); https://www.hbomax.com/faq/do-i-already-have-access (instructing customers to download the

HBO Max app on devices); https://help.hbomax.com/us/Answer/Detail/000002506 (providing step by

step installation instructions for HBO Max on supported devices: "Phone or tablet", "Computer" or "TV

device"); https://help.discoveryplus.com/hc/en-us/articles/32717633822615-discovery-supported-

devices (same and adding game consoles). Warner Bros. instructs customers to sign up for a plan, tells

customers "After you sign up, we make it quick and easy to activate your new streaming accounts," and,

to start streaming, instructs the customer to "[d]ownload and log in to the…HBO Max app[] separately

to start watching on your favorite screens." *See, e.g.*, https://www.hbomax.com/bundle/disney-plus-

hulu?_referrer=eyJzY3JlZW5OYW1lIjoiSEJPIE1heCB8IFN0cmVhbSBTZXJpZXMgYW5kIE1vdmllc

yIsInNjcmVlblVSSSI6Imh0dHBzOi8vd3d3Lmhib21heC5jb20vIn0%3D.  In response, third parties

acquire, configure and operate the Accused Services in an infringing manner.

161.    Warner Bros. actively encourages the installation and use of its application and

services on consumer devices as described above.

162.    Warner Bros. knowingly and intentionally encourages customers of Warner Bros.

Accused Services to directly infringe the '322 patent. For example, Warner Bros. conditions customers

use and access to the Accused Services as described above in the Terms of Use for the Accused

Services. Warner Bros. further provides support to sign up and download the apps for the Accused Services and technical support to such customers. *See, e.g.*, https://help.discoveryplus.com/hc/en-us/sections/32717613049367-Technical-Issues (discovery+ technical support); https://help.discoveryplus.com/hc/en-us/requests/new (discovery+ technical support request submission form); https://help.hbomax.com/us/Home/Index (HBO Max support for sign up, getting started, trouble shooting, downloading and settings).

163.    Warner Bros. customers' use of the Accused Services to stream video constitutes direct infringement of the '322 patent, as described, for example, in Exhibit 7. Warner Bros. knowingly induces such infringement by providing the Accused Services and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Original Complaint, Warner Bros. knows that the induced conduct would constitute infringement—and intends that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

164.    Warner Bros.' infringement of the '322 patent is willful as of the filing of the Original Complaint.

165.    Warner Bros.' infringement has damaged and will continue to damage BitHarmony, and BitHarmony is entitled to recover from Warner Bros. damages sustained as a result of Warner Bros.' infringement of the '322 patent, but in no event less than a reasonable royalty.

## COUNT IV: PATENT INFRINGEMENT OF U.S. PATENT NO. 9,826,259

166.    BitHarmony incorporates by reference the preceding paragraphs as though fully set forth herein.

167.    Pursuant to 35 U.S.C. § 282, the '259 patent is presumed valid.

40

168.     Warner Bros. had knowledge and notice of the '259 patent no later than filing of the Original Complaint.

169.     Warner Bros. infringes the '259 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of the '259 patent.

170.     On information and belief, Warner Bros. has infringed and continues to infringe one or more claims of the '259 patent, including but not limited to claim 12, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Services.

171.     Warner Bros. makes, uses, sells, offers for sale, and/or imports the Accused Services in this District and elsewhere in the United States, and thus directly infringes the '259 patent.

172.     For example, attached as Exhibit 8, and incorporated herein by reference, is a claim chart setting forth a description of at least one example of Warner Bros.' infringement of at least system claim 12 of the '259 patent. Exhibit 8 applies claim 12 to the Accused Services. The descriptions and infringement theories in Exhibit 8 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Warner Bros. in the course of this case.

173.     As shown in the exemplary claim chart of Exhibit 8, Warner Bros. infringes the '259 patent by, for example, using in the United States methods covered by at least claim 12 of the '259 patent and thus directly infringes the '259 patent, literally or under the doctrine of equivalents in violation of 35 U.S.C. § 271.

174.     Warner Bros.' infringement of the '259 patent is willful as of the filing of the Original Complaint.

175.      Warner Bros.' infringement has damaged and will continue to damage BitHarmony, and BitHarmony is entitled to recover from Warner Bros. damages sustained as a result of Warner Bros.' infringement of the '259 patent, but in no event less than a reasonable royalty.

## ATTORNEYS' FEES

176.      BitHarmony is entitled to recover reasonable and necessary attorneys' fees under applicable law.

## DEMAND FOR JURY TRIAL

177.      BitHarmony demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, BitHarmony respectfully requests that this Court enter judgment in its favor as follows and afford BitHarmony the following relief:

A.  adjudge and declare that Warner Bros. has infringed and continues to infringe the claims of the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B.  adjudge and declare that Warner Bros.' infringement of the Asserted Patents was willful, and that Warner Bros.' continued infringement is willful on and after the date of the Original Complaint;

C.  award BitHarmony damages pursuant to 35 U.S.C. § 284 in an amount adequate to compensate for Warner Bros.' infringement of the Asserted Patents going back six years from the date of the Original Complaint, in an amount to be determined at trial, but not less than a reasonable royalty;

D.  award BitHarmony enhanced damages pursuant to 35 U.S.C. § 284;

E.  award BitHarmony pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

F.  adjudge and declare that this is an exceptional case and award BitHarmony its

reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.  order an accounting of damages for acts of infringement; and

H.  award such other relief, including equitable relief, that the Court deems appropriate.


Respectfully submitted,

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
Virginia K. Lynch (No. 7423)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
glynch@shawkeller.com
*Attorneys for Plaintiff BitHarmony LLC*

OF COUNSEL:
Blair M. Jacobs
Christina A. Ondrick
John S. Holley
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, D.C. 20005
(202) 237-2727

Dated: February 11, 2026