**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BITHARMONY LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>WARNER BROS. DISCOVERY, INC., WARNER BROS. HOME ENTERTAINMENT INC., WARNERMEDIA DIRECT, LLC, and HOME BOX OFFICE, INC.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 26-160 (WCB) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff BitHarmony LLC filed this patent infringement lawsuit alleging that defendants Warner Bros. Discovery, Inc., Warner Bros. Home Entertainment Inc., WarnerMedia Direct, LLC, and Home Box Office, Inc., have infringed four patents owned by BitHarmony: U.S. Patent No. 7,707,485 ("the '485 patent"); U.S. Patent No. 9,258,605 ("the '605 patent"); U.S. Patent No. 9,641,322 ("the '322 patent"); and U.S. Patent No. 9,826,259 ("the '259 patent"). D.I. 27. The defendants have moved to dismiss BitHarmony's Amended Complaint, arguing that (1) BitHarmony has failed to sufficiently plead knowledge in order to support its induced infringement and willfulness claims, (2) all claims of the '485, '605, and '322 patents are ineligible for patenting under 35 U.S.C. § 101, and (3) BitHarmony has failed to sufficiently plead direct infringement by any specific defendant or for any specific accused product. D.I. 29, 30.

BitHarmony has filed a response, D.I. 31, and the defendants have filed a reply, D.I. 32.[1] For the reasons set forth below, the defendants' motion is granted. BitHarmony's Amended Complaint is dismissed, but BitHarmony is granted leave to file a second amended complaint.

## I. Background

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." The Third Circuit has instructed district courts to conduct a two-part analysis in evaluating a motion to dismiss for failure to state a claim. First, the district court must separate the factual and legal elements of the claims. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. "In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference." *Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc.*, 209 F. Supp. 3d 744, 752 (D. Del. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The facts set forth in this order are based on the allegations in the Amended Complaint and the exhibits that are attached to it.

The '485 patent, which issued on April 27, 2010, is titled "System and Method for Dynamic Transrating Based on Content." It discloses "[e]xemplary techniques for modifying multimedia data based on content." D.I. 27-1 at Abstract. The '485 patent discloses improvements to "the

[1] BitHarmony requested oral argument on the defendants' motion to dismiss. D.I. 33. In reviewing the papers, I do not find that oral argument is necessary and deny the request.

automated selection of encoding parameters driven by rule-based content analysis," "aggressive data reduction on less important segments . . . while retaining quality for primary content," and a "hardware-based . . . approach [to the] detection of characteristics (like volume spikes or motion) and corresponding content actions [that] are tightly coupled with the video processing pipeline, thus facilitating optimization of the data stream for specific devices or networks." D.I. 27 at ¶ 58. Independent claim 1 recites:

> 1. A method comprising:
>
> receiving, using a multimedia processing device, multimedia data representing multimedia content of a program;
>
> identifying a select template of a plurality of templates based on the program using the multimedia processing device, wherein the select template comprises a plurality of rules, each rule comprising a characteristic and one or more actions to be performed by multimedia processing device in association with the characteristic, the one or more actions comprising at least one action selected from a group consisting of: changing a bit rate of the multimedia data; changing a resolution of the multimedia data; and changing an audio volume of the multimedia data;
>
> analyzing the multimedia content using the multimedia processing device to determine characteristics of the multimedia content; and
>
> modifying, using the multimedia processing device, the multimedia data based on an application of the plurality of rules of the select template to the characteristics of the multimedia content.

The '605 patent, which issued on February 9, 2016, is titled "System and Method for Transrating Based on Multimedia Program Type." It discloses "an improved technique for processing multimedia data for storage or distribution." D.I. 27-2, col. 1, ll. 34–35. In particular, the '605 patent discloses purported improvements to "the functioning of video transcoding hardware, specifically the dynamic calibration of encoding parameters based on program classification," "enabling different rate profiles for different program types," and a "hardware-based approach where program content and rate control logic are tightly coupled with the video transcoding pipeline, thus facilitating automated compliance with varying network requirements." D.I. 27 at ¶ 76. Independent claim 19 of the '605 patent recites:

> 19. A system comprising:
>
> a storage device;
>
> an interface to receive multimedia data representative of a multimedia program;
>
> a content analyzer operably coupled to the interface and configured to:
>
> > determine a multimedia program type of the multimedia program; and
> >
> > determine a peak bit rate limit and an average bit rate limit based on the multimedia program type, the average bit rate limit being different than the peak bit rate limit; and
>
> a transcoder operably coupled to the interface and the content analyzer, the transcoder configured to transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit and having an average bit rate not greater than the average bit rate limit.

The ’322 patent, which issued on May 2, 2017, is titled “Container Agnostic Decryption Device and Methods for Use Therewith.” It discloses “[a] video processing device for decrypting a compressed video signal includes a key storage device for storing at least one decryption key.” D.I. 27-3 at Abstract. In particular, the ’322 patent discloses improvements to “video processing architecture, enabling efficient hardware-based decoding of partially encrypted media streams while reducing memory overhead, avoiding unnecessary decryption cycles, and maintaining synchronization integrity within compressed video systems.” D.I. 27 at ¶ 102. Independent claim 11 of the ’322 patent recites:

> 11. A method for decrypting a compressed video signal from at least one partially encrypted elementary bit stream, the method comprising:
>
> a machine that includes:
>
> > storing at least one decryption key in a key storage device; and
> >
> > executing instructions via a processor to:
> >
> > > retrieve the at least one decryption key from the key storage device;
> > >
> > > segment the at least one partially encrypted elementary bit stream into a plurality of blocks, wherein segmenting the plurality of blocks includes separating the plurality of blocks into a first subset of blocks of standard length and a second subset of blocks of non-standard length; and decrypt at least one partially encrypted elementary bit stream into a decrypted elementary bit stream, by

> applying a first of a plurality of decryption methods for decrypting each of the first subset of blocks of standard length and applying a second of the plurality of decryption methods for decrypting each of the second subset of blocks of non-standard length separately from the first subset of blocks of standard length;
>
> wherein first portions of the at least one partially encrypted elementary bit stream are encrypted and second portions of the at least one partially encrypted elementary bit stream are unencrypted.

The ’259 patent, which issued on November 21, 2017, is titled “Managed Degradation of a Video Stream.” It discloses “[a] system and a method for simultaneous transmission of multiple media streams in a fixed bandwidth network.” D.I. 27-4 at Abstract. The ’259 patent further discloses improvements to “the functioning of a gateway media server, specifically the automated orchestration of an adaptive bandwidth footprint across a plurality of data streams to ensure ‘sustained delivery within acceptable parameters,’” the “implementation of an egress-aware rate control mechanism that solves the ‘transmission rate problem’ inherent in certain networks,” and “integrating a real-time feedback loop directly into [a] ‘transcoding vector processors,’ allowing [a] server to monitor the delta between the ‘actual time of frame transmission completion’ and the ‘estimated transmit time.’” D.I. 27 at ¶ 127 (citations omitted). Independent claim 1 of the ’259 patent recites:

> 1. A method comprising:
>
> determining if a first portion of a display stream is transmissible via a transmission link such that the display stream will be displayed in real time at a client device;
>
> compressing the first portion of the display stream in a first compression manner to produce a first compressed display stream portion when it is determined that the first portion of the display stream is not transmissible over the transmission link such that the display stream will be displayed in real time at the client device;
>
> wherein the first portion of the display stream is determined to be transmissible such that the display stream will be displayed in real time when an expected time of transmission of a second portion of the display stream via the transmission link is within a predetermined tolerance of an actual time of transmission of the second portion of the display stream via the transmission link; and

> wherein the first portion of the display stream includes data compressed in a second compression manner different than the first compression manner, wherein the first compression manner represents a high degree of data compression than the second compression manner.

On February 11, 2016, BitHarmony filed a complaint alleging that the defendants had infringed the ’485 patent, the ’605 patent, the ’322 patent, and the ’259 patent. D.I. 1. After the defendants filed a motion to dismiss, D.I. 17, BitHarmony filed its Amended Complaint, adding almost 70 pages of allegations and also including as an exhibit a 71-page declaration from its technical expert, Dr. Kevin C. Almeroth. D.I. 27, 27-9. The defendants again moved to dismiss on various grounds. D.I. 29, 30.

The parties have brought to the court’s attention co-pending litigation in another court between BitHarmony and a different defendant involving some of the same patents that are at issue in this case. *See* D.I. 30 at 3–4; D.I. 34. As part of that co-pending litigation, the United States District Court for the Eastern District of Virginia has made eligibility decisions related to some of the claims involved in this case. *See BitHarmony, LLC v. Amazon.com, Inc.*, No. 1:25-CV-02449, 2026 WL 1257368 (E.D. Va. May 7, 2026).

## II. Discussion

### A. Knowledge Relevant to Induced Infringement and Willfulness

The defendants begin by arguing that BitHarmony’s allegations of pre-suit knowledge “improperly rel[y] on speculation” and fail as a matter of law. D.I. 30 at 7. Specifically, the defendants argue (1) that BitHarmony’s allegations only amount to an assertion of generalized industry awareness of the patents-in-suit; (2) that based on general monetization efforts by ViXS Systems, Inc., BitHarmony’s predecessor-in-interest, the defendants or their predecessors-in-interest must have been aware of the asserted patents, although Bit Harmony points to no specific evidence of such knowledge; and (3) that ViXS and Time Warner Cable Inc., the defendants’

predecessor-in-interest, participated in a consortium of technology partners, through which, according to BitHarmony, they would likely have become aware of the BitHarmony patents. *Id.* at 7–8.

The defendants assert that Bit Harmony's allegations are insufficient to support a claim of pre-suit knowledge of Bit Harmony's patents, for purposes of BitHarmony's theories of liability that require proof of such knowledge. The defendants also argue that BitHarmony (1) failed to plead post-suit knowledge because BitHarmony cannot rely on its original complaint to satisfy the knowledge requirement, (2) failed to plead that any defendant knew its conduct constituted infringement, and (3) made only conclusory allegations without supporting facts as to BitHarmony's allegations that the requirement of knowledge is satisfied by evidence of willful blindness on the part of the defendants. *Id.* at 8–10. Accordingly, the defendants argue that BitHarmony's induced infringement and willfulness claims should be dismissed or stricken.

BitHarmony responds that its proof of pre-suit knowledge only has to reach a plausibility standard at this stage of the case and does not require "specific allegations of patent discussions" by the defendants, particularly because information about such discussions would be "uniquely within Defendants' possession and unavailable absent discovery." D.I. 31 at 3–5. BitHarmony also responds that (1) its complaints may be used to establish post-suit knowledge, (2) its Amended Complaint plausibly pleaded knowledge of infringement with allegations related to ViXS's activity, and (3) in the alternative, its Amended Complaint plausibly pleaded willful blindness with allegations that, through ViXS's outreach, the defendants suspected BitHarmony's patents existed but deliberately avoided investigating them. *Id.* at 5–6. BitHarmony also argues that *Inari Medical, Inc. v. Inquis Medical, Inc.*, 2025 WL 2912857 (D. Del. Oct. 14, 2025), forecloses dismissal of its willfulness allegations. D.I. 31 at 6–7.

The defendants reply that BitHarmony's admission that it needs discovery to supply unpled facts illustrates that the Amended Complaint's allegations as to induced infringement and willfulness are insufficient. D.I. 32 at 2. The defendants also argue that BitHarmony's reliance on *Inari* is misplaced, as the defendants do not challenge willfulness under Rule 12(b)(6), but instead seek to strike BitHarmony's willfulness allegations under Federal Rule of Civil Procedure 12(f). *Id.* at 3.

I agree with the defendants that, even accepting as true the allegations in the Amended Complaint, BitHarmony's allegations are legally insufficient to plausibly plead pre-suit knowledge. In response to the defendants' motion to dismiss, BitHarmony directs the court to paragraphs 135 through 163 of the Amended Complaint. *See* D.I. 31 at 3–5. In those paragraphs, BitHarmony alleges that (1) the defendants "regularly monitor[] video streaming technology advances," D.I. 27 at ¶ 134; (2) ViXS publicly announced that it "had received an independent valuation of its entire intellectual property portfolio," *id.* at ¶ 135, which comprised 510 patents and patent applications, including the asserted patents, *id.* at ¶ 138; (3) ViXS participated in a targeted outreach to potential licensees or acquirors that "would have been sent to major streaming market participants," *id.* at ¶ 140; and (4) ViXS also participated in communications "with media companies, including those with streaming solutions," about its patent portfolio, *id.* at ¶ 145.

BitHarmony further alleges that ViXS "was an active technology partner in the Reference Design Kit ('RDK') consortium, a pre-integrated, standardized software stack for video processing and delivery managed by Time Warner Cable Inc. ('Time Warner Cable'), Comcast Corporation, and Liberty Global plc," *id.* at ¶ 152 (footnote omitted), and ViXS "also maintained a key partnership with Intel targeting the cable set-top box market, further extending ViXS's technology footprint into the cable industry ecosystem in which Defendants' predecessor, Time Warner Cable

and its affiliates, operated," *id.* at ¶ 153 (footnote omitted). BitHarmony alleges that, as "a sophisticated technology company, Time Warner Cable's participation in RDK and its direct engagement with ViXS chipset technology gave rise to actual or constructive knowledge of the ViXS patent portfolio, including the Asserted Patents or their patent applications, by no later than 2015,"[2] and such "knowledge is imputed to Warner Bros. Discovery through the subsequent corporate acquisitions and consolidations." *Id.* at ¶ 154 (footnote omitted).

BitHarmony also alleges that ViXS commenced an International Trade Commission Investigation that, "on information and belief," caused DirecTV, LLC—a company later acquired by AT&T, Inc., which also eventually acquired Time Warner Cable—to "conduct[] a comprehensive analysis of the ViXS patent portfolio, including the Asserted Patents and their specifications, prosecution histories, and claim scope." *Id.* at ¶¶ 155–57. BitHarmony alleges that the knowledge contained in that analysis was then attained by AT&T upon its acquisition of DirecTV. *Id.* at ¶ 156.

None of those allegations show that the defendants (or any of their predecessors-in-interest) had knowledge of the asserted patents. *See MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 232 (D. Del. 2012) ("This court has not been convinced of the sufficiency of pleadings charging knowledge that is based upon a defendant's participation in the same market,

---

[2] Only one of the asserted patents, the '485 patent, issued prior to 2016. BitHarmony acknowledges that several of the asserted patents did not issue until after the dates of some of the events it relies on to plead pre-suit knowledge. D.I. 27 at ¶ 146. To the extent that the Amended Complaint suggests that the defendants were aware of the applications that later issued as the other three asserted patents, awareness of a patent application alone generally does not support a finding of pre-suit knowledge. *See NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. CV 19-1031, 2019 WL 5626647, at *3 (D. Del. Oct. 31, 2019), *report and recommendation adopted sub nom. NexStep, Inc. v. Comcast Cable Commc'n, LLC*, No. CV 19-1031, 2019 WL 11663798 (D. Del. Nov. 15, 2019); *Helios Streaming, LLC v. Vudu, Inc.*, No. CV 19-1792, 2021 WL 254069, at *4–5 (D. Del. Jan. 26, 2021), *report and recommendation adopted*, No. CV 19-1792, 2021 WL 1138024 (D. Del. Mar. 25, 2021).

media publicity[,] and unrelated litigation by the defendant's competitors concerning the relevant patent."). BitHarmony's allegations about various press releases do not allege that those press releases listed the asserted patents or ever reached the defendants or their predecessors-in-interest. BitHarmony's allegations about outreach to sell ViXS's intellectual property portfolio only speculate that the defendants may have been contacted based on their being participants in the industry. And BitHarmony's allegations about companies that are not the defendants participating in industry consortiums or being subject to litigation that was not alleged to involve the asserted patents provide no sound basis from which to infer that the defendants had knowledge of the asserted patents. The factual allegations in BitHarmony's Amended Complaint, even when accepted as true, stop well short of plausibly alleging the defendants had pre-suit knowledge of the asserted patents. Speculative allegations that require layers of inferences, even when thoroughly pleaded, are not enough to survive a motion to dismiss.[3] *See Omni Medsci, Inc. v. Whoop, Inc.*, No. CV 25-140, 2025 WL 2720998, at *4 (D. Del. Sept. 24, 2025) ("Even taken together, those allegations do not suggest that Whoop had knowledge of the '533 patent family, which is a critical missing link, as knowledge for indirect infringement and willfulness must consist of knowledge

[3] BitHarmony also alleges that, "[o]n information and belief, in connection with the Black Stone IP valuation and monetization campaign, Black Stone IP and/or ViXS contacted Defendants or their predecessors regarding the ViXS patent portfolio and provided Defendants or their predecessors with information regarding the patent portfolio, including the valuation, the identity of each Asserted Patent, and information demonstrating their infringement of each Asserted Patent." D.I. 27 at ¶ 144. However, BitHarmony immediately qualifies that allegation by stating that "[t]his allegation is made on information and belief because the identity of companies contacted by Black Stone IP and/or ViXS during the monetization campaign, and specifically contacts with Defendants or their predecessors, are information uniquely in Defendants' possession, and not available to BitHarmony without discovery. The plausibility of this allegation is supported by the foregoing facts, as well as the following facts." *Id.* I will thus not accept as true the allegation that ViXS or Black Stone IP contacted the defendants or their predecessors regarding the ViXS patent portfolio and the asserted patents, as the Amended Complaint qualifies that allegation as speculation based on other pleaded facts that do not support an inference of knowledge.

of the particular patent at issue. Accordingly, . . . the allegations here do not sum to more than their parts." (citing *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985))).

In support of its argument that the facts demonstrate willful blindness on the defendants' part as to the existence of the asserted patents, D.I. 31 at 6, BitHarmony points to paragraphs 160 through 163 of the Amended Complaint.[4] Review of BitHarmony's willful blindness allegations, however, do not save its claim of pre-suit knowledge. The allegations on which BitHarmony relies, including that "Warner Bros. lacks written policies . . . regarding monitoring or avoidance of patent infringement by Warner Bros. and lacks mechanisms for employees to report patents which they believe Warner Bros. may infringe," D.I. 27 at ¶ 163, fall far short of evidence that the defendants believed that there was a high probability that BitHarmony owned patents directed to the defendants' technology and took steps to avoid learning of those patents. That evidence is therefore insufficient to support BitHarmony's claim of willful blindness. *See Omni Medsci*, 2025 WL 2720998, at *4; *VLSI Tech. LLC v. Intel Corp.*, No. CV 18-0966, 2020 WL 3488584, at *5 (D. Del. June 26, 2020).

Because of the inadequacy of the allegations of pre-suit knowledge, infringement and willfulness theories involving the '485, '605, '322, and '259 patents that are premised on an allegation of pre-suit knowledge of those patents will be dismissed.[5]

---

[4] Willful blindness has "two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Willful blindness is thus a standard that "surpasses recklessness and negligence." *Id.*; *see also id.* at 770 ("By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not." (citations omitted)).

[5] Should new evidence come to light in discovery that shows the defendants had pre-suit knowledge of the asserted patents—evidence that is not just an extension of the speculative theories discussed above—the court will consider a motion to amend the complaint regarding this issue.

The defendants next assert that filing a complaint is legally insufficient to support post-suit knowledge. D.I. 30 at 8–9. I have held otherwise in prior cases, particularly where, as here, the post-suit allegations appear in an amended complaint that demonstrates knowledge of the asserted patents from the time of the original complaint. *See, e.g.*, *Omni Medsci*, 2025 WL 2720998, at *2–3 (citing cases). Accordingly, BitHarmony has satisfied the requirements for showing post-suit knowledge of the asserted patents, and the defendants' motion to dismiss will be denied as to that issue.

**B. Eligibility of the '485, '605, and '322 Patents Under Section 101**

Section 101 of the Patent Act defines patent-eligible subject matter. It states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has interpreted that provision to carve out exceptions to that broad characterization of patentable subject matter for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

The framework for determining whether a patent is directed to an unpatentable abstract idea is well settled. The Supreme Court's decision in *Alice* established the now-familiar two-step test for patentability in that context. The first step entails determining whether the claim at issue is directed to an "abstract idea." The second step entails determining whether the claim contains an "inventive concept" that removes the claimed subject matter from the realm of abstraction. *See id*. at 217–18; *see also Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72–73 (2012).

Patent eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). The Federal Circuit has held that patent eligibility can be determined at the Rule 12(b)(6) stage. *See, e.g.*, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016). That is true, however, only when there are no factual allegations that, taken as true, would prevent resolving the eligibility question as a matter of law. The Federal Circuit has explained that "plausible factual allegations may preclude dismissing a case under § 101 where, for example, 'nothing on th[e] record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6).'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (alteration and omission in original) (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016)).

The defendants argue that all the claims of the '485, '605, and '322 patents are ineligible under section 101. They specifically address claim 1 of '485 patent, claim 19 of the '605 patent, and claim 11 of the '322 patent, and they assert that those claims are representative of the remaining asserted claims of each of those patents. D.I. 30 at 10–20.

As to claim 1 of the '485 patent, the defendants argue that a district court in the Eastern District of Virginia has held claim 1 to be patent-ineligible under section 101 in a different action, and that BitHarmony is therefore estopped from arguing against ineligibility here. *Id.* at 10. On the merits, the defendants argue that the claim is directed to the abstract idea of "classifying data and applying generic rules" at *Alice* step one and that the claim adds no inventive concept at *Alice* step 2. *Id.* at 10–11.

As to claim 19 of the ’605 patent, the defendants argue that the Virginia district court has held that claim 19 “is directed to the abstract idea of applying predetermined bit rate limits to multimedia data based on program type” at *Alice* step one and that the pleadings in this case show claim 19 contains no qualifying inventive concept at *Alice* step two. *Id.* at 12–16.

As to claim 11 of the ’322 patent, the defendants argue that the Virginia district court invalidated claim 9 of the closely related U.S. Patent No. 9,088,805, and that the same reasoning applies to claim 11, which “is directed to the abstract idea of separating blocks by length (classifying data) and applying decryption methods to the separated blocks (based on the classification)” at *Alice* step one with no inventive concept being added at *Alice* step two. *Id.* at 17–20.

BitHarmony responds that the patent eligibility issues cannot be resolved on the pleadings because the Amended Complaint and its incorporated exhibits present specific factual allegations that the claimed inventions were neither routine nor conventional. D.I. 31 at 7. BitHarmony specifically contends that the defendants’ reliance on the Eastern District of Virginia court’s decision is misplaced, as the expert declaration incorporated into its Amended Complaint in this case was not before the Virginia district court, which had “a materially thinner record.” *Id.* at 7–8. BitHarmony further contends that the defendants’ estoppel argument does not apply, is conclusory, and fails to engage with any element of the four-part test for applying collateral estoppel. *Id.* at 9. BitHarmony also presents what it contends are plausible and specific factual allegations that aspects of the claims are inventive, such as those laid out in BitHarmony’s Amended Complaint and expert declaration. Those allegations, according to BitHarmony, are sufficient at the pleading stage of the case, and a court may not resolve such factual disputes against the patentee. D.I. 31 at 10 (citing *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019)).

BitHarmony further argues that each of the identified independent claims of the patents are either not abstract, not conventional, or both, as well as arguing that the defendants have not met their burden to show the discussed independent claims are representative of the other claims of the patents. *Id.* at 11–21.

The defendants reply that the expert declaration BitHarmony relies on consists of conclusory statements that the court may disregard. D.I. 32 at 3–4. The defendants further argue that the relevant question is what the claims recite, but that BitHarmony improperly relies on the patents' specifications and the expert declaration to support its theory of eligibility. *Id.* at 4–5; *see also id.* at 6–9 (discussing each patent). As to representativeness, the defendants contend that BitHarmony's arguments are insufficient to show that the claims at issue are not representative for purposes of the section 101 analysis. *Id.* at 9–10.

The defendants' argument for applying collateral estoppel based on the decision of the district court in the Eastern District of Virginia is presented in two sentences and one citation in its opening brief. The application of non-mutual collateral estoppel, however, requires a careful consideration of several factors, including whether the party to be estopped had a full and fair opportunity to litigate the issue in the first case and whether a final judgment has been entered in the first case. *See Montana v. United States*, 440 U.S. 147, 153 (1979); *Uniloc USA, Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1346 (Fed. Cir. 2022). BitHarmony challenges the application of collateral estoppel on both of those grounds. Moreover, even if collateral estoppel is applicable to some of the claims at issue in this case, it is not applicable to all of them. The wiser course is therefore to postpone disposition of that issue to allow further development of the record and fuller briefing.

On the merits of the section 101 issue, the defendants contend, in a one-paragraph argument, that the claims of the ’485 patent (particularly claim 1) are directed to an abstract idea.[6] In view of the cursory analysis given to that issue, I decline to address that issue at this stage of the proceeding. That is particularly true in light of the fact that even if I were to find that the asserted claims of the three patents at issue are directed to an abstract idea, I would not dismiss the claims unless I could conclude that those claims also fail step two of the *Alice* test by not containing an inventive concept. With regard to that issue, I must accept as true all factual allegations made in the Amended Complaint and in the complaint record. And in view of the “plausible and specific factual allegations that aspects of the claims are inventive,” claim 1 of the ’485 patent—and claim 19 and 11 of the ’605 and ’322 patents, respectively—cannot be dismissed under step two of the *Alice* test at the motion to dismiss stage. *Cellspin*, 927 F.3d at 1317.

BitHarmony argues that claim 1 of the ’485 patent is not ineligible for patenting, because the combination disclosed by claim 1 was not well understood, routine, or conventional as of the priority date of that claim. As support, BitHarmony directs the court to the Amended Complaint, which cites the patent’s specification, and Dr. Almeroth’s declaration. D.I. 31 at 11. The Amended Complaint alleges that, as of the ’485 patent’s priority date, “the state of the art in multimedia distribution was characterized by the increasing adoption of Digital Video Recorders” but that “these devices faced a fundamental ‘content-blind’ transcoding bottleneck, i.e., a rigid tradeoff where the device either indiscriminately reduced quality to save space or limited storage capacity to retain quality.” D.I. 27 at ¶ 47 (citations omitted). The Amended Complaint alleges that “the convention was to use fixed transcoding parameters that were not tuned for the type of content

[6] The defendants’ brief also devotes short sections to arguing that the claims of the ’605 patent (particularly claim 19) and the claims of the ’322 patent (particularly claim 11) are directed to abstract ideas. *See* D.I. 30 at 13–14, 17–19.

being encoded, i.e., the convention was content-blind transcoding, which resulted in indiscriminate quality reduction or indiscriminate storage consumption" and "the concept of 'content-aware' or 'per-title' encoding, . . . was not well understood, routine, and conventional in 2005." *Id.* at ¶ 49 (citations omitted). "The '485 patent addresses the burdens of content-blind transcoding by implementing 'dynamic transrating based on content,' where a 'transrater' analyzes content characteristics to selectively modify the bit rate or resolution of specific portions of the data, ensuring the 'modified multimedia data' retains quality where it matters while reducing file size elsewhere." *Id.* at ¶ 50 (citation omitted).

The Amended Complaint also alleges that the "claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the automated selection of encoding parameters driven by rule-based content analysis," and "introduce[] a unique hardware-based . . . approach where detection of characteristics (like volume spikes or motion) and corresponding content actions are tightly coupled with the video processing pipeline, thus facilitating optimization of the data stream for specific devices or networks" and "provid[ing] a distinct performance advantage over generic transcoding solutions." *Id.* at ¶ 58 (citation omitted). The Amended Complaint further alleges that "[t]he inventive benefits of the '485 patent over prior solutions primarily stem from its approach to utilizing context-aware 'rules templates' to drive encoding decisions based on 'program information,' rather than applying a single static compression standard across the entire file, which allows the system to 'reduce the overall amount of multimedia data without materially affecting the multimedia content of the program that a viewer is likely to care about.'" *Id.* at ¶ 59 (citation omitted). "These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of conventional approaches," and, as "Dr. Almeroth explains, the claimed 'architecture improves the functioning of the multimedia

processing device itself' [and] . . . 'the claimed invention changes how the encoder operates, not merely the information it processes.'" *Id.* (citations omitted).

Accepting these statements as true, I find that the defendants have not met their burden to show that claim 1 of the '485 patent lacks an inventive concept and fails under *Alice* step 2. *See Aatrix*, 882 F.3d at 1128 ("Whether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact. And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice. There are concrete allegations in the second amended complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity. There are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer. We have been shown no proper basis for rejecting those allegations as a factual matter."); *see also id.* at 1127 (holding that amendment after dismissal based on section 101 would not be futile because "Aatrix's proposed second amended complaint supplies numerous allegations related to the inventive concepts[,] . . . describes the development of the patented invention, including the problems present in prior art[, and] . . . then presents specific allegations directed to 'improvements and problems solved by the Aatrix patented inventions.'" (citation omitted)).

The same is true for the other two patents the defendants challenge on section 101 grounds. The defendants' reliance on the Virginia district court's decision is unconvincing, and considering the stage of the proceeding, the asserted claims survive at least the *Alice* step two analysis.

As to claim 19 of the '605 patent, the defendants rely on the Virginia district court's decision because the court held that claim 19 is directed to an abstract idea. But the court also held that claim 19 sufficiently recites an inventive concept to prevent dismissal at the motion to dismiss

stage. The argument that the Virginia district court's decision supports holding claim 19 ineligible in this proceeding is thus a perplexing one. Not only did the Virginia district court not hold the claim ineligible, but the complaint record in this case, which includes many factual assertions I must accept as true, was not part of that litigation, *see* D.I. 31 at 7–8.

As in the case of claim 1 of the '485 patent, to support that the combination disclosed by claim 19 of the '605 patent was not well-understood, routine, or conventional at its priority date, BitHarmony directs the court to the Amended Complaint, which cites the patent specification and Dr. Almeroth's declaration to support BitHarmony's allegations. D.I. 31 at 12–13. The Amended Complaint alleges that, as of "September 2006, conventional multimedia devices still faced a 'choice of either content quality or storage space,' because they utilized content-blind processing." D.I. 27 at ¶ 64 (citations omitted). The Amended Complaint alleges that "[t]he '605 patent departs from these content-blind approaches by introducing content-aware transcoding" that "determines a 'peak bit rate limit' and an 'average bit rate limit' based on the 'multimedia program type,' enabling the system to tailor bitrate constraints to the characteristics of the content." *Id.* at ¶ 66 (citation omitted). "Using the peak and average bit rate limits, the inventors recognized that the transcoder could 'maintain the average bit rate' with 'minimal visual quality loss' even when the framesets have 'higher motion and complexity' where the peak bitrate limit would allow for more data for that scene up to the limit thereby maintaining 'a higher visual quality' for higher motion/complex scenes." *Id.* at ¶ 68 (citations omitted).

The Amended Complaint further alleges that "[t]he inventive benefits of the '605 patent over prior solutions stem from its approach to utilizing 'multimedia program type' to determine 'peak bit rate' and 'average bit rate' limits, rather than applying a single static compression standard across the entire file, which allows the data generated by the transrating process to be

modulated according to the capabilities of the device and the network bandwidth," which "enables adaptive control where bit rate limits are adjusted according to the media content," thus "overcom[ing] the inefficiencies, inflexibility, and vulnerabilities of conventional approaches that force a rigid choice between content quality or data associated with the stream." *Id.* at ¶ 74 (citations omitted). The Amended Complaint also alleges that the "claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the dynamic calibration of encoding parameters based on program classification," which "contributes a significant inventive advantage by enabling different rate profiles for different program types . . . [and] solv[es] a unique optimization problem in video systems regarding the efficient use of storage and transmission bandwidth." *Id.* at ¶ 76. The Amended Complaint further alleges that "[t]he patent introduces a unique hardware based approach where program content and rate control logic are tightly coupled with the video transcoding pipeline, thus facilitating automated compliance with varying network requirements." *Id.*

The Amended Complaint thus contains allegations related to the '605 patent claims' inventive concept, describes the development of the patented invention, including the problems present in prior art, and then presents specific allegations directed to improvements and problems solved by the patented invention. *See Aatrix*, 882 F.3d at 1127–28. Accepting those allegations as true, the defendants have not met their burden to show that claim 19 lacks an inventive concept and fails under *Alice* step 2.

For claim 11 of the '322 patent, the defendants first point to the holding by the Virginia district court that a claim from a different patent is ineligible, arguing that claim 9 of the '805 patent is similar to the claim at issue in this case. D.I. 30 at 17. But again, as in the case of the '485 and '605 patents, BitHarmony supports its contention that the combination disclosed by claim

11 of the '322 patent was not well understood, routine, or conventional as of its priority date by directing the court to the Amended Complaint, which cites to the patent specification and Dr. Almeroth's declaration to support BitHarmony's allegations. D.I. 31 at 13–14. The Amended Complaint alleges that as of 2012, "digital content delivery was limited by container-centric encryption protocols, such as encrypted Internet Protocol (IP) packets, Transport Streams (TS), or Packetized Elementary Streams (PES)[, ]where the entire payload of the container was encrypted," such that a skilled artisan "would understand that these prior systems treated compressed media as opaque containers, without distinguishing between structural framing information and compressed payload data." D.I. 27 at ¶ 85 (citations omitted). The Amended Complaint alleges that "[t]his container-centric approach created significant technical limitations in video processing systems." *Id.* at ¶ 86. The Amended Complaint then alleges that the "patent addresses these technical problems by introducing an unconventional container agnostic encryption architecture that shifts the security boundary by performing encryption and decryption at the Elementary Stream (ES) level rather than the container level," where "[c]ompressed payload data is encrypted while structural start code sequences remain unencrypted, allowing video processing devices to retain access to essential framing information while preserving content security across any transport medium." *Id.* at ¶ 89. The Amended Complaint alleges that "[t]his shift enables hardware video processing systems to perform operations such as trick play, indexing, and seamless splicing without requiring full decryption of the media container, thereby reducing computational overhead and avoiding unnecessary exposure of clear compressed content in system memory." *Id.* (citation omitted). The Amended Complaint also alleges that "the inventor[s] further identified a technical problem arising from the interaction between partially encrypted elementary streams and block-cipher decryption mechanisms" and sought to "resolves this issue by introducing a dual-mode

processing architecture in which partially encrypted elementary streams are segmented into standard-length and non-standard-length block subsets, and different decryption methods are applied to each subset." *Id.* at ¶¶ 90, 92.

The Amended Complaint further alleges that "the claims of the '322 patent provide innovative unconventional technological solutions" as "the claimed architecture is unconventional because it does not encrypt the entire container." *Id.* at ¶ 105. "This specific technical improvement improves security and reduces latency and memory bandwidth by eliminating the need for the expensive and redundant transfers to/from memory buffers required by traditional container-level decryption." *Id.* (citation omitted).

BitHarmony's Amended Complaint thus contains allegations related to the '322 patent claims' inventive concept, describes the development of the patented invention, including the problems present in the prior art, and then presents specific allegations directed to improvements and problems solved by the patented invention. *See Aatrix*, 882 F.3d at 1127–28. Accepting these statements as true, the defendants have not met their burden to show that claim 11 lacks an inventive concept and fails under *Alice* step 2.

Having not held ineligible any of the independent claims specifically addressed by the defendants, I decline to consider whether those claims are representative of the remainder of the claims of the asserted patents. While further proceedings in this case may shed additional light on that issue, for present purposes the court concludes that the defendants have not shown that the asserted claims are directed to patent-ineligible subject matter. Accordingly, the court denies the defendants' motion to dismiss BitHarmony's Amended Complaint based on patent ineligibility under 35 U.S.C. § 101.

**C. Direct Infringement**

The defendants next argue that the Amended Complaint lacks a direct infringement claim against any single defendant because it fails to identify with specificity the particular defendants that engaged in particular acts of infringement. The Amended Complaint initially defined a collective reference to all the defendants as "Warner Bros." but then later referred to a non-party as "Warner Bros." D.I. 30 at 20–21. The defendants also argue that BitHarmony's claim charts do not accuse any particular product from a particular defendant of infringement; instead, the charts attribute the accused functionality to an enterprise referred to as "WBD," cite materials from multiple entities without identifying which named defendant is responsible for the accused conduct, and fail to identify a specific infringing product or system, advancing a composite theory of the accused products instead. *Id.* at 21–22. As a result, the defendants contend that they have not been provided with notice as to what alleged infringing conduct any individual defendant is accused of.

BitHarmony first responds that any ambiguity caused by its use of the term "Warner Bros." in paragraphs 157 through 159 of the Amended Complaint to refer to an entity other than one of the defendants should be resolved in BitHarmony's favor and does not justify dismissing the complaint. D.I. 31 at 22. BitHarmony also contends that the claim charts incorporated into the Amended Complaint sufficiently identify the defendants' accused products by accusing their "direct-to-consumer (DTC) streaming services platforms" with "[c]ommon sense dictat[ing] that defendant Home Box Office, Inc. infringes through 'HBO' and 'HBO Max,' and Warner Bros. Discovery, Inc. through 'Discovery Channel' and 'discovery+.'" *Id.* at 22–23. BitHarmony further points to the allegations in its Amended Complaint that the defendants' services operate

"substantially the same way" because "Warner Bros. employs the same technical platform and infrastructure for all Accused Services." *Id.* at 23 (quoting D.I. 27 at ¶ 133).

The defendants reply that nothing within the Amended Complaint supports BitHarmony's assertion that the redefinition of the non-party as "Warner Bros." is limited to paragraphs 157 through 159. D.I. 32 at 10–11. The defendants further reply that BitHarmony's appeal to common sense to draw inferences about which defendant is infringing through which accused product is also improper and cannot be used as a replacement for sufficient pleadings. *Id.* at 11. The defendants also note that the Amended Complaint alleges only that the various services operate similarly, not that any defendant practices every claim limitation. *Id.* (citing D.I. ¶ 133).

First, BitHarmony represents that it was an error for the Amended Complaint to define the non-party Warner Bros. Entertainment as "Warner Bros." after collectively referring to the defendants by the same name. D.I. 31 at 22. Reading the Amended Complaint as a whole, and in the light most favorable to BitHarmony, indicates that BitHarmony is accusing the four named defendants of the acts of infringement and errs only in using the same abbreviation for a separate entity in paragraphs 157 through 159 of the Amended Complaint. That error alone would not be grounds for dismissal, but as the court will dismiss the Amended Complaint with leave to amend as discussed previously, BitHarmony will be allowed to correct that error should it choose to submit a second amended complaint.

Regarding the defendants' contention that the Amended Complaint does not accuse any particular product from a particular defendant of infringement, I agree. BitHarmony emphasizes that it alleged that the defendants' "services operate 'substantially the same way' because 'Warner Bros. employs the same technical platform and infrastructure for all Accused Services'" and that its "claim chart cites Defendants' own websites and descriptions of their technology." D.I. 31 at

23 (quoting D.I. 27 at ¶ 133). BitHarmony specifically points the court to paragraphs 133, 171, 191, 211, and 232 and page 1 of Exhibit 5 to its Amended Complaint in support of that contention. *Id.* at 22–23. Exhibit 5 includes the following description on page 1:

> Accused Services: Warner Bros. Discovery (WBD)'s direct-to-consumer (DTC) streaming services platforms, e.g., discovery+, HBO, HBO Max, Max, Premium Sports Product, etc., which collectively include brand/products, such as, Discovery Channel, Max, discovery+, CNN, DC, TNT Sports, Eurosport, HBO, HGTV, Food Network, OWN, Investigation Discovery, TLC, Magnolia Network, TNT, TBS, truTV, Travel Channel, MotorTrend, Animal Planet, Science Channel, Warner Bros. Motion Picture Group, Warner Bros. Television Group, Warner Bros. Pictures Animation, Warner Bros. Games, New Line Cinema, Cartoon Network, Adult Swim, Turner Classic Movies, Discovery en Español, Hogar de HGTV and others. The "Accused Services" are backend processes, including, for example, transcoding, e.g., transrating, content-adaptive encoding, per-title encoding, file-based video transcoding, etc., and encoding, for the purpose of providing videos to users. In other words, the "Accused Services" encompass the entirety of WBD's DTC streaming platforms, including Max, discovery+, and HBO, alongside the underlying backend processes such as transcoding, transrating, and per-title encoding.

Reviewing the parts of the record that BitHarmony has identified, BitHarmony has not directed the court to any place in the Amended Complaint where BitHarmony ties specific acts of infringement to each specific defendant. BitHarmony instead argues that "[c]ommon sense dictates that defendant Home Box Office, Inc. infringes through 'HBO' and 'HBO Max,' and Warner Bros. Discovery, Inc. through 'Discovery Channel' and 'discovery+.'" *Id.* But even if I were to accept BitHarmony's "common sense" argument, which I do not, that argument serves only to separate Home Box Office from Warner Bros. Discovery, Warner Bros. Home Entertainment, and WarnerMedia Direct. BitHarmony's explanation of common sense seems simple enough that, if true, the division of the defendants that it now describes should have been included in the Amended Complaint. In addition, BitHarmony's explanation does not separate out the three Warner defendants to identify which defendant is accused of infringement with respect to which accused product. Nor does BitHarmony's explanation seem to cover each of the accused

products. For example, it does not explain which defendant is associated with the "Premium Sports Product" platform and any of its included brands. And BitHarmony also does not dispute that its charts, which it cites only generally and invites the court to dig through on its own, provide a composite of sources on the various systems it accuses and not any allegations against a specific accused product. This composite pleading regarding how the accused products meet the claim limitations adds to the notice problem raised by the defendants.

A complaint must put a defendant on notice of the claims against it, and Rule 12(b)(6) requires that a complaint alleging patent infringement against multiple defendants "adequately identif[y] specific infringing acts" of each defendant. *Mayne Pharma Int'l PTY Ltd. v. Merck & Co.*, No. CV 15-438, 2015 WL 7833206, at *3–4 (D. Del. Dec. 3, 2015), *report and recommendation adopted*, No. CV 15-438, 2016 WL 9344010 (D. Del. Jan. 21, 2016); *North Star Innovations, Inc. v. Toshiba Corp.*, No. CV 16-115, 2016 WL 7107230, at *2 (D. Del. Dec. 6, 2016). While a plaintiff may refer to all named defendants collectively within a count, the count must incorporate previous allegations identifying the specific infringing acts of the individual defendants. *Mayne*, 2015 WL 7833206, at *3. BitHarmony's Amended Complaint does not meet that standard. Here, BitHarmony's Amended Complaint and its attached infringement charts do not identify with clarity any specific defendant's infringing acts. *See Promos Techs., Inc. v. Samsung Elecs. Co.*, No. CV 18-307, 2018 WL 5630585, at *3 (D. Del. Oct. 31, 2018); *North Star Innovations*, 2016 WL 7107230, at *2. BitHarmony's pleadings thus do not put the individual defendants on notice of what specific infringing acts they are accused of. However, this problem

does not appear to be incurable. Accordingly, the court will allow BitHarmony to amend its complaint to address the defendants' challenges to its direct infringement claims.[7]

## III. Conclusion

The defendants' motion to dismiss BitHarmony's Amended Complaint is granted. BitHarmony's Amended Complaint is dismissed without prejudice and with leave to amend to address the defendants' arguments regarding its direct infringement claims. If BitHarmony wishes to file a Second Amended Complaint, the changes in that version of the complaint will be limited to the grounds discussed above at pages 22–26 of this order. Any further motion to dismiss by the defendants will be limited to the new allegations in the Second Amended Complaint.

BitHarmony will be given 10 days from the date of this order to file a Second Amended Complaint.

The defendants' motion to dismiss based on section 101 is denied.

The defendants' motion to dismiss the allegations regarding pre-suit knowledge of the plaintiff's patents is granted.

IT IS SO ORDERED.

SIGNED this 14th day of October, 2026.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

[7] In their reply brief, the defendants argue that amendment of the complaint would be futile, but they do so only in reference to their section 101 arguments. D.I. 32 at 11–12. The defendants also contend that BitHarmony has not properly sought leave to amend under the local rules. *Id.* However, it is within a court's discretion to allow amendment of a complaint, even absent an express request by the plaintiff. *See Arlington Techs. LLC v. RingCentral, Inc.*, No. 1:25-CV-00613, 2026 WL 674178, at *8 (D. Del. Mar. 10, 2026).